**Linda A. CORSINI and Alan Cantara, on behalf of themselves and all persons similarly situated,**

v.

**UNITED HEALTHCARE SERVICES, INC., a Minnesota for-profit corporation, and its affiliate, United Health Plans of New England, Inc., a Rhode Island health maintenance organization, and XYZ Corporations 1-10.**

**No. CA 96–0608–T.**

United States District Court, D. Rhode Island.

May 17, 2001.

Amato A. DeLuca, Bret W. Jedele, De-Luca & Weizenbzum, Ltd., Providence, RI, Wood Robertson Foster, Jr., Jordan Matthew Lewis Siegel, Brill, Greupner & Duffy, Milwaukee, WI, Peter N. Wasylyk, Providence, RI, for plaintiffs.

Angel Taveras, Brown, Rudnick, Freed & Gesmer, Providence, RI, Lewis A. Remele, Jr., Kevin Patrick Hickey, Brassford, Lockhart, Truesdell & Briggs, Minneapolis, MN, Peter S. Hendrixson, Dorsey & Whitney LLP, New York, NY, Timothy E. Branson, Richard W. Murphy, Dorsey & Whitney, P.L.L.P., Minneapolis, MN, Jeffrey C. Shreck, Providence, RI, for defendants.

Mark A. Reinhalter, U.S. Dept. of Labor, Office of Solitor, Plan Benefits Sec. Div., Washington, DC, for Alexis M. Herman, amicus.

## Decision

TORRES, Chief Judge.

This is a class action brought against United HealthCare of New England (UHCNE) [1], a health maintenance organization (HMO), and its parent corporation, United HealthCare Services, Inc. (UHS), (jointly referred to as United) for alleged violations of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. The plaintiffs, who were subscribers to a health care plan administered and insured by United (the Plan), claim that United's method of calculating subscribers' co-payment obligations as a percentage of the charges billed by health care providers, rather than as a percentage of the lesser amounts that the providers agreed to accept from the HMO, as payment for their services, constitutes a violation of the Plan that is actionable under 29 U.S.C. § 1132(a)(1)(B) (the "plan enforcement claim"), and/or a breach of fiduciary duty that violates 29 U.S.C. § 1132(a)(3)(the "breach of fiduciary duty claim").[2]

After hearing the evidence presented during a non-jury trial and after making the findings of fact set forth below, this Court directs that judgment be entered for the plaintiffs with respect to the plan enforcement claim and for the defendants with respect to the breach of fiduciary duty claim.

### Facts

UHCNE is an HMO that is a wholly owned subsidiary of UHS. Since UHCNE has no employees, all of its functions are performed by UHS employees pursuant to the terms of an Administrative Services Agreement between the two corporations.

United offers group health care plans to the employees of various businesses. The businesses negotiate the terms of the plans with United and pay a portion of the premiums for employees who choose to subscribe to the plans. Under the plans, United makes payment for covered services that subscribers receive from health service providers. In some cases, the subscribers may be required to pay a portion

---

1. UHCNE formerly was known as United Health Plans of New England, Inc. (UHPNE).

2. *See Corsini v. United Healthcare Corp.,* 965 F.Supp. 265 (D.R.I.1997), dismissing a third claim for reimbursement on the ground that the plaintiffs have failed to exhaust their administrative remedies.

of the charge, which portion is called a "co-payment."

In order to minimize the amounts paid, United has established a "network" of "participating" providers who have agreed to accept discounted fees for covered services rendered to United subscribers. These discounted fees, which also are referred to as "contract fees," or "fee schedule amounts," generally are substantially less than the amounts that the providers maintain they otherwise would charge.

Because "non-participating" or "out-of-network" providers have not agreed to accept discounted fees, their services are covered only in cases of emergency or when they have been pre-approved by United. Furthermore, United pays only that portion of a non-participating provider's fee that United deems to be reasonable and customary.

At issue in this case are the subscribers' percentage co-payment obligations for services received from network providers under plans in effect prior to 1998.[3] Although the terms of those plans varied, all of the plans requiring percentage "co-payments" defined the co-payment obligation as a specified percentage (usually 20%) of "Eligible Expenses," which, in turn, were defined as the "reasonable and customary charges" for covered services. "Reasonable and Customary Charges" were further defined as "fees for Covered Health Services and supplies which, in [UHCNE's] judgment, are representative of the average and prevailing charge for the same Health Service in the same or similar geographic communities where the Health Services are rendered and which do not exceed the fees that the provider would charge any other payor for the same services."

When a network provider rendered a service for which a co-payment was required, the provider submitted a claim to United on a Health Care Financing Authority form (HCFA 1500), which is the standard form used for Medicare reimbursements and has become the standard claim form in the health insurance industry. The form described the service and stated the fee "charged" or "billed" by the provider which, invariably, was greater than the "contract fee" that the provider had agreed to accept for services rendered to United subscribers.[4]

United multiplied the "charged" or "billed" fee by the applicable co-payment percentage in order to calculate the subscriber's co-payment obligation and, then, subtracted the co-payment amount from the "contract fee" to determine how much it owed to the provider. Before remitting its share of the "contract fee" to the provider, United subtracted a small amount called the "PCR withhold." At the end of each year, United would determine how much of the PCR withhold would be paid to a provider. It is not clear exactly how that determination was made, but it appears that the calculation was based, in part, on United's profits and, in part, on the extent to which the provider helped to reduce costs by actions such as minimizing referrals to specialists.

The provider billed the subscriber directly for the co-payment amount. Because United calculated the co-payment by multi-

---

3. By 1998, all of United's subscribers were covered by new plans that defined the percentage co-payment as a percentage of the "contract fee."

4. Apparently, the higher fee was the amount that the provider claimed it would have charged to those who were not United subscribers and it was set forth on form HCFA 1500 for statistical purposes in order to preserve what the provider maintained should be its fee profile for that service.

plying the specified co-payment percentage by the provider's "charged" fee instead of by the "contract fee," the amount paid by the subscriber invariably represented a greater percentage of the fee received by the provider than the specified co-payment percentage. United never informed its subscribers that their co-payments were based on "charged" fees rather than "contract fees."

When an "out-of-network" provider rendered a covered service, United also calculated the co-payment as a percentage of the "charged" fee. However, since the provider had not agreed to a lesser "contract fee," United determined its obligation by subtracting the co-payment amount from what it considered to be the "reasonable and customary" charge for the service rendered. The provider then was free to bill the subscriber for the difference between the fee "charged" by the provider and the amount paid by United, a procedure known as "balance-billing."

Before calculating the "co-payment" amount for services rendered by network providers, United made no effort to determine whether the "charged" fees were "reasonable and customary." However, at trial, United presented statistical studies purportedly showing that the "charged" fees at issue in this case fall below the 95th percentile of fees generally charged by providers for those services.

The experiences of Linda Corsini and Alan Cantara, the class representatives, illustrate how the process worked. Corsini subscribed to a United plan through her employer, Allendale Insurance. On August 25, 1995, Corsini was treated by Podiatry Specialists, a participating provider in United's network. The services she received required a 20% co-payment. Podiatry Specialists' "charged" fee was $980 and Corsini was billed for 20% of that amount or $196. However, Corsini learned that

Podiatry Specialists' "contract fee" was only $523.99 and that United's payment was $327.99, the difference between the "contract fee" and the "co-payment" calculated by United. Thus, Corsini's "co-payment" was 37% of the amount to which Podiatry Specialists actually was entitled.

Cantara subscribed to a plan offered through his employer, Stanley Bostich. In January 1995, Cantara underwent hernia surgery at Rhode Island Hospital, a service that, under his plan, required a 20% co-payment. Cantara's co-payment was determined to be $496.26, or 20% of the $2,481.31 "charged" by the hospital. Cantara discovered that the hospital's "contract fee" was $1,111.00 and that United had paid only $614.74, which meant that his co-payment was 45% of the total amount payable to the hospital. Cantara also received follow-up treatment from network providers who "charged" a total of $1,490 for their services; and, once again, United calculated his co-payment as 20% of that amount and not 20% of the $500 in "contract fees" for those services.

Corsini and Cantara claim that, by calculating co-payments as a percentage of the fees "charged" by providers rather than as a percentage of the "contract fees" that providers have agreed to accept for their services, and, by failing to disclose this to subscribers, United has violated both the terms of its plans and its fiduciary duty to subscribers. The certified class that Corsini and Cantara represent includes all subscribers to United's ERISA health care plans who incurred percentage-based co-payment obligations after February 27, 1990, (i.e., within six years before this action was commenced) that were greater than they would have been if this obligation had been calculated on the basis of the discounted "contract fees" pay-

able to providers.[5]

## Conclusions of Law

### I. *The Plan Enforcement Claim*

■ Under 29 U.S.C. § 1132(a)(1)(B), a participant in an ERISA health care plan may bring "a civil action ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." An action brought pursuant to this provision, essentially, is a breach of contract action, and in determining whether there has been a breach, the terms of the plan "must be interpreted under principles of federal substantive law." *Burnham v. Guardian Life Insurance Co. of America*, 873 F.2d 486, 489 (1st Cir.1989).

In this case, the alleged breach relates to the manner in which United calculated subscribers' co-payments. As already noted, the Plan at issue defines "co-payment" as a specified percentage, usually 20%, of "Eligible Expenses," which, in turn, are defined as "Reasonable and Customary Charges for Health Services covered under the Policy." "Reasonable and Customary Charges" are further defined as "fees for covered Health Services, and supplies which, in [UHCNE's] judgment, are representative of the average and prevailing charge for the same Health Service in the same or similar geographic communities where the Health Services are rendered and which do not exceed the fees that the providers would charge any other payor for the same services."

The plaintiffs contend that the Reasonable and Customary Charge for services rendered by a network provider should be construed to mean the "contract fee" that the provider agreed to accept for treatment of United subscribers, and not the amount "charged" by the provider.

### A. *Standard of Review*

■ Since contract construction is a matter of law, a fiduciary's interpretation of an ERISA plan's terms, ordinarily, would be reviewed *de novo. Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 952, 103 L.Ed.2d 80 (1989). However, when the plan vests the fiduciary with discretion to construe its terms and to determine eligibility for benefits, the administrator's decision is reviewed only for an abuse of discretion unless the administrator "is operating under a conflict of interest," in which case the "conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948.

■ Here, the Plan in question confers on United "sole and exclusive discretion in interpreting the benefits Covered under the PLAN·and the other terms, conditions, limitations and exclusions set out in the Policy and in making factual determinations related to the Policy and its benefits." However, since United's interpretation of "reasonable and customary charge" reduced the amount that United, as insurer, was required to pay to network providers and correspondingly increased its subscribers' co-payment obligations, United was "operating under a conflict of interest." As the First Circuit has observed, such a conflict frequently exists when the plan administrator also is the insurer that must pay the benefits to which it deter-

---

5. The statute of limitations for breach of fiduciary claims brought pursuant to § 1132(a)(3) is six years. However, the statute of limitations for plan enforcement claims brought pursuant to § 1132(a)(1)(B) is three years. Therefore, the class of plaintiffs who may be entitled to recover for plan violations would include only those who subscribed after February 27, 1993.

mines that a subscriber is entitled. *See Doe v. Travelers Insurance Co.,* 167 F.3d 53, 57 (1st Cir.1999).

Although a conflict arising from a "general interest in conserving resources is [not] the kind of conflict that warrants de novo review," *Travelers,* 167 F.3d at 57, it "must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948. The standard to be applied in such cases is one of "reasonableness." *Travelers,* 167 F.3d at 57.

## B. *Reasonableness of United's Interpretation*

■ In determining whether a contract interpretation is reasonable, one must consider the intent of the parties, the circumstances under which the contract was entered into and the manner in which an "average person" would interpret the terms. *See Wickman v. Northwestern National Insurance Co.,* 908 F.2d 1077, 1084 (1st Cir.1990). Here, there are several reasons why it was not reasonable for United to construe the term "reasonable and customary charges" to mean whatever amounts were "charged" or "billed" by providers.

■ To begin with, given the facts of this case, United's interpretation was not consistent with the terms of the Plan. The Plan defines reasonable and customary charges as:

> fees ... which in [United's] judgment, are representative of the average and prevailing charge for the same Health Service in the same or similar geographic communities where the Health Services are rendered and which do not exceed the fees the providers would

charge any other payor for the same services.

Thus, in order for a charge to be considered "reasonable and customary," United had to determine that the charge:

1. reflected the "average and prevailing" charges for the service rendered; and

2. did not exceed the amount that the provider charged others for such service.

However, United made no attempt to do either.[6] That failure stands in marked contrast to United's practice of paying to out-of-network providers who did not agree to accept discounted fees, only those amounts that it considered reasonable and customary for the service rendered which, generally, was much less than the amount "billed."

United's *post hoc* attempt to establish that the "charged" amounts were "reasonable and customary" charges because they were below the 95th percentile of fees generally charged for similar services is too little, too late. The statistics cited by United are nothing more than a compilation of the amounts "charged" by providers for particular services. They do not reflect the amounts actually paid for those services; and, therefore, cannot be described as "prevailing" charges. Put another way, the amounts "charged" are amounts that the providers, unilaterally, decided that their services were worth rather than amounts that the marketplace determined to be reasonable and customary for those services.

Nor is, there any basis for United's assertion that charges below the 95th percentile are, *per se,* reasonable. While there may be a range of charges that could be considered "reasonable and customary,"

---

6. In fact, the evidence indicates that it may not have been possible to determine the amounts charged by providers to other third-party payors because the agreements with those payors customarily prohibited disclosure of such information.

the wide variations between charges at the top and bottom of the range proposed by United make it difficult to accept the notion that all charges within that range are *per se* reasonable. That difficulty is compounded by the fact that no analysis was made to determine whether deviations of this magnitude are within commonly accepted statistical norms. In short, it distorts the meaning of the term to describe fees as "reasonable and customary" simply because they are less than the amounts "charged" by 5% of providers.

Finally, in addition to being inconsistent with the Plan's definition of "reasonable and customary charges," United's proffered interpretation of the manner in which co-payments should be calculated is contrary to the meaning conveyed by reading the Plan as a whole. The gist of the Plan is that it covers described services subject to any applicable co-payment by the subscriber, which, in this case, is "20% of Eligible Expenses" relating to those services. *See* PX 14 § 10. The Plan describes "Eligible Expenses" as the "reasonable and customary charges ... *incurred* " [emphasis added] for the service but does not state what is meant by an "incurred" charge. Since a network provider is entitled only to the "contract fee," it is difficult to see how United and/or its subscriber could "incur" an expense greater than that. Accordingly, the only reasonable interpretation of the Plan is that "Eligible Expenses" refers to the *actual* cost of services rendered and that United is responsible for 80%, and the subscriber is responsible for 20%, of those costs for which a co-payment is required. Under United's interpretation, the subscriber's obligation increases to 20% of the amount that the provider asserts that it would have charged but for the limitations im-

posed by its contract with United. The extent to which United's interpretation subverts what a reasonable person would understand to be the coverage afforded by the Plan is illustrated by the fact that, in several thousand cases, the "co-payments" calculated by United were as much as 100% of the amounts to which providers were entitled.[7] United cannot alter the manner in which the Plans are reasonably understood by including ambiguous terms such as "charges ... incurred" and then adopting strained interpretations that are most favorable to it.

It is conceivable that the amount "charged" by a provider might be a "reasonable and customary" charge, but there is no indication that this was true in the instant case. Moreover, it might be permissible for a health care plan to specify that co-payments will be calculated as a percentage of "charged" fees instead of "contract fees," but United's Plan contained no such provision and, in fact, implied the opposite. In short, under these circumstances, United's interpretation of the Plan is unreasonable and the Court must construe the Plan to determine how the plaintiffs' co-payment obligations should have been calculated. More specifically, the Court must decide, how, under these circumstances, an average, ordinary person would interpret the phrase "reasonable and customary charges ... incurred." *See Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077, 1084 (1st Cir. 1990).

In making that decision, the Court may consider both the factors already mentioned as grounds for rejecting the reasonableness of United's interpretation and the usual rules that govern construction of contracts. Thus, the Court takes into account the well-established principle that

7. Dr. Goldstein, the plaintiff's statistician, testified that, in 5,349, or 1.4%, of the claims at issue for the period 1993-1998, the co-payment was 100% of the provider's contract fee.

ambiguous terms in a contract should be construed against the party that drafted it, in this case, United.

As previously noted, the Plan describes a "co-payment" as a percentage of eligible expenses incurred, but do not specify who must have incurred the expenses. Since a network provider is entitled to collect only the "contract fee," it is difficult to see how United and/or its subscribers could be considered to have "incurred" expenses exceeding that amount simply because they were "charged" by the provider.

The implausibility of such an interpretation, coupled with United's failure to determine whether the amounts "charged" by providers were, in fact, "reasonable and customary" compel the conclusion that "eligible expenses" should not be read as referring to the amounts "charged." The only fees for which evidence of reasonableness has been presented are the "contract fees" between United and its network providers. Unlike the "charged" amounts that are unilaterally determined by the providers, the "contract fees" are negotiated, at arms length, and, therefore, presumably are within the range of what could be considered the market value of the services. Furthermore, the "contract fees" were the only charges "incurred" for services rendered by network providers. Consequently, in this case, eligible expenses can only be read as referring to "contract fees."

## II. *The Breach of Fiduciary Duty Claim*

ERISA permits a participant in a health care plan to bring a civil action

(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or

(B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).

█ Subsection (a)(3) provides for equitable relief and may be invoked only if an adequate remedy is not available under subsection (a)(1)(B). *Corsini v. United HealthCare Corp.*, 51 F. Supp.2d 103, 105 (D.R.I.1999). Put another way, "subsection (a)(3) does not create an alternative theory" upon which suits alleging ERISA violations may be brought. *Id.* Rather, it is designed to deal with violations for which no other remedy exists. *Id.*

Another distinction between subsections (a)(1)(B) and (a)(3) is that claims brought pursuant to subsection (a)(1)(B) are governed by a three-year statute of limitations whereas a six year statute of limitations applies to claims brought pursuant to subsection (a)(3). In this case, that distinction is important because it affects the number of class members who may be entitled to relief.

█ Here, the plaintiffs' claim under subsection (a)(3) is one for breach of fiduciary duty. It is based on 29 U.S.C. § 1104(a)(1), which provides in pertinent part that a "fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." Specifically, plaintiffs allege that United breached its duty of loyalty in three ways: 1) by failing to disclose the fact that United had contracted with providers to pay them discounted amounts that were less than the amounts the providers "billed" the member; 2) by using the discounted fees to subsidize United's competitive standing in the marketplace; and 3) by obtaining the discounted fees from providers in exchange for allowing providers to submit "charges" that increased the co-payments obtained from subscribers.

While the evidence shows that United never informed subscribers that the "contract fees" paid to providers were less than the "billed" amounts used to calculate co-payments, that failure, alone, is not actionable under subsection (a)(3). The plaintiffs' claim arises from United's method of calculating their co-payments, not from United's failure to explain that method. Moreover, as previously stated, that method violated the terms of the Plans, a violation for which subsection (a)(1)(B) provides an adequate remedy.

The plaintiffs' remaining arguments are summarily rejected because they were neither developed nor supported by any evidence. The plaintiffs failed to establish anything improper about United's purpose in negotiating discounted fees with providers or the manner in which those negotiations were conducted. More specifically, there was not a scintilla of evidence to support the assertion that United allowed providers to increase the amounts "charged" in order to increase the co-payment portion of the "contract fee" paid by subscribers. There was evidence that the amount of the PCR withhold disbursed to providers may have been influenced by United's profitability each year, but that falls far short of proving that United induced, or even allowed, providers to artificially inflate their bills for the purpose of reducing United's share of the contract fees.

### III. *Damages*

The measure of damages that the plaintiff class is entitled to recover on its plan violation claim is the difference between the co-payment obligations that class members incurred and the co-payment obligations that they would have incurred if those obligations had been calculated as 20% of the "reasonable and customary charges ... incurred" for the services received. As already noted, the only available measure of what was "reasonable and customary" are the "contract fees" which the providers agreed to accept.

Since the plan violation claim is governed by a three-year statute of limitations, the applicable period begins on February 27, 1993, which is three years before this action was commenced, and the parties agree that it ends in 1998, by which time all of United's plans provided for calculating the co-payment obligation as a percentage of the "contract fee".[8]

There is no real dispute regarding that amount. It was calculated by the plaintiffs' statistician using data supplied by United, and was reduced to take into account "negative damages."[9] That amount is $4,387,263.47, which includes interest through November 27, 2000.

### Conclusion

For all of the foregoing reasons, on Count I, the clerk is directed to enter judgment in favor of the plaintiff class (i.e., subscribers who made percentage-based co-payments at any time after February 27, 1993 that were greater than such co-payments would have been had the co-payments been calculated as a percentage of the lesser "contract fees" rather than

---

**8.** *See* n. 3, *supra.*

**9.** Negative damages occur in rare circumstances where the "charges" from the provider are *less* than the amount the provider receives from United and the subscriber. This only occurs with providers such as hospitals, which receive a set amount based on the type of procedure and the projected length of the patient's stay in the hospital. When the actual stay is shorter than the projected stay, the hospital receives more than if it charged for the actual stay. Negative damages incurred by the class members were subtracted from the class members' positive damages to get the net damages.

the amounts "charged" by providers) in the amount of $4,387,263.47, plus interest from November 27, 2000. On Count II, the clerk is directed to enter judgment in favor of the defendants.

Plaintiffs' counsel is directed to file, within 30 days of the date of this order, a proposed method of 1) distributing the proceeds of the judgment entered against defendants to the class members, and 2) providing the Court with an accounting of the distribution.

IT IS SO ORDERED,