**James ALVES and Hillel Stavis, individually and on behalf of persons similarly situated, Plaintiffs,**

v.

**HARVARD PILGRIM HEALTH CARE, INC., Harvard Pilgrim Health Care of New England, Inc., a Massachusetts corporation, Harvard Pilgrim Health Care of New England, Inc., a Rhode Island corporation, Harvard Vanguard Medical Associates, Inc., and Pilgrim Health Care, Inc. Defendants.**

No. CIV.A.99–CV–12559–PB.

United States District Court, D. Massachusetts.

June 4, 2002.

Stuart T. Rossman, Boston, MA, Frederic L. Ellis, Edward A. Broderick, Edward D. Rapacki, Ellis & Rapacki, Boston, MA, for Plaintiffs.

Michael A. Walsh, John Scott L. McConchie, Daniel P. Tighe, Griesinger & Walsh, LLP, Boston, MA, for Defendants.

### *MEMORANDUM AND ORDER*

SARIS, District Judge.

### I. *INTRODUCTION*

This case presents the interesting question of whether a sponsor of a health care benefit plan subject to the Employee Retirement Income Security Act ["ERISA"] may charge its members a "copayment" for certain prescription drugs that sometimes exceeds its own per-unit cost because of discounting arrangements with

prescription drug providers. Plaintiffs James Alves and Hillel Stavis bring this proposed class action claiming that the defendants' decision to charge copayments in excess of costs, their failure to disclose material information pertaining to the prescription drug costs, and their disclosure of misleading information violated the terms of the plans and constituted a breach of fiduciary duty under ERISA and federal common law.[1] They seek compensatory damages, disgorgement of unlawful profits, restitution, declaratory and injunctive relief and other equitable remedies. Defendants have moved for summary judgment on all claims. For the reasons set forth below, defendants' motion for summary judgment is *ALLOWED* on all counts.

## II. UNDISPUTED FACTS

### A. Background

#### 1. Defendants

The class representatives, James Alves and Hillel Stavis, bring this class action against five defendants. Four of the five are non-profit sponsors of employee health benefit plans: Harvard Pilgrim Health Care, Inc. ("HPHC") (formerly called Harvard Community Health Plan, Inc., or "HCHP"), licensed to do business in Massachusetts and Rhode Island; Pilgrim Health Care, Inc. ("PHC"), also licensed to do business in Massachusetts and Rhode Island; Harvard Pilgrim Health Care of New England, Inc. ("HPNE–MA"), incorporated in Massachusetts; and Harvard Pilgrim Health Care of New England, Inc. ("HPNE–RI"), incorporated in Rhode Is-

land.[2] The fifth defendant, Harvard Vanguard Medical Associated, Inc. ("HVMA"), is a non-profit corporation that operates health centers and dispenses prescription medications to members of certain HPHC plans pursuant to contracts with HPHC. Of the five defendants, HPHC is the dominant corporate entity. It is closely intertwined with each of the remaining four defendants. Not only does HPHC partially control HVMA, but PHC, HPNE–RI and HPNE–MA are its wholly owned affiliates.

#### 2. Plaintiffs

Through his employer, plaintiff Alves was a member of HPHC and PHC health insurance plans from November 1, 1995 through May 31, 1999. Alves and his family purchased twenty-three prescriptions for which the copayment exceeded defendants' cost for the drug purchase. Plaintiff Stavis was a member of plans offered by HPHC (and HCHP) from April 27, 1992 through May 31, 2000. Among the prescription drug purchases his family and he made through these plans, seventy-nine exceeded the cost for the drugs. Neither of the two plaintiffs is currently a member of any HMO sponsored by any defendant.

#### 3. The Plans

Although the copayment provisions of the plans to which plaintiffs belonged (PHC and HPHC) contain minor differences in wording, their essential features are the same. First of all, the two plans define "copayments" in almost identical

---

1. Specifically, the second amended class action complaint alleges that defendants breached the terms of the plan under 29 U.S.C. § 1132(a)(1)(b) (Count One); that defendants breached their fiduciary duty under 29 U.S.C. § 1132(a)(1)(b) and 29 U.S.C. § 1132(a)(3) (Count Two); that defendants were unjustly enriched (Count Three); that plaintiffs should

be granted equitable relief pursuant to 29 U.S.C. § 1132(a)(1)(b) and 29 U.S.C. § 1132(a)(3) (Count Four); and that plaintiffs should be granted declaratory relief (Count Five).

2. HPNE–RI was placed in liquidation in 2000 pursuant to Rhode Island law.

terms. PHC defines the term as the "specific charge which a member is required to pay for certain benefits described in this document"; HPHC defines it as "fees payable by members for certain covered services."

With regard to copayment amounts, the HPHC plan (called the Added Choice Plan), which was in effect when Stavis enrolled, provides:

> When the Member's Employer Group has purchased the prepaid drug benefit, HCHP provides coverage for Medically Necessary prescription drugs and certain Medically Necessary non-prescription drugs and medical supplies subject to the following conditions and limitations .... The Copayment is $5 per prescription, or per refill for up to a 30–day supply.

Stip., Ex. D at 1361. The HPHC member agreement in effect from 1998 until 1999 includes a bold-faced section called "Copayment," which states in pertinent part:

> Each Copayment below applies to up to a 30–day supply of a prescription or refill.
>
> • $5 per prescription or refill for those drugs listed in the Formulary....
>
> • $10 per prescription or refill for those drugs not listed in the Formulary ....

Stip., Ex. DD at 1412.

The PHC Plan rider in effect from November 1995 until May 31, 1998 similarly provides: "Benefits shall be available for prescription drugs .... subject to a nine dollar ($9) co-payment for brand name drugs and a three dollar ($3) co-payment for generic drugs." Stip. Ex. U at S–15.

Further cost information is available for HPHC, which distributes drugs through in-house pharmacies at health centers and a network of independent pharmacies like CVS. The ingredient cost to HPHC of a single prescription dispensed at an in-house pharmacy varied from about $.01 to more than $15,000.00; the average cost was $38.56 in 2000; $34.77 in 1999; $30.61 in 1998; $27.12 in 1997; $23.74 in 1996; and $20.90 in 1995. The ingredient cost to HPHC of a single prescription dispensed at an independent network pharmacy varied from $.02 to more than $8,600.00, while the average cost (in the form of a reimbursement payment) was $42.13 in 2000; $43.10 in 1999; $37.49 in 1998; $33.71 in 1997; $30.42 in 1996; and $31.05 in 1995. (*See* App. B, Def.'s Mem. Supp. Mot. Sum. J., Aff. of James Kenney, ¶¶ 5–7)

**B. *Standard of Review***

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)), *cert. denied,* 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour,* 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

## III. DISCUSSION

### A. Standing

Defendants HPNE–MA and HPNE–RI argue that plaintiffs lack standing to bring suit against them because neither plaintiff was ever a member of an ERISA plan that they sponsor.

■ It is well established that "standing must be personal to and satisfied by 'those who seek to invoke the power of federal courts.'" *Allee v. Medrano*, 416 U.S. 802, 828, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). "[A] named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs .... Standing cannot be acquired through the back door of a class action." *Id.* at 828–29, 94 S.Ct. 2191.

■ When a single defendant offers a range of ERISA plans, an individual in one plan can represent a class of plaintiffs—including some belonging to other plans—as long as "the gravamen of the plaintiff's challenge is to the general practices [of the defendant] which affect all of the plans."

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422 (6th Cir.1998). *See also Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993) (same); *Sutton v. Med. Serv. Ass'n of Pa.*, 1993 WL 273429, *5 (E.D.Pa.1993) (same).

■ While ordinarily "a plaintiff who has no cause of action against [a] defendant can not 'fairly and adequately protect the interests' of those who do have such causes of action," an exception may apply to cases in which "all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir.1973); *see also Moore v. Comfed Savings Bank*, 908 F.2d 834, 838 (11th Cir.1990) (permitting joinder of defendant banks that had no dealings with class representatives).

Under *Fallick*, I conclude that plaintiffs' claims against HPNE–MA and HPNE–RI should not be dismissed for lack of standing. Because these defendants are wholly owned affiliates of HPHC, in which plaintiffs were participants, and the copayment plan provisions are substantially the same, a single resolution of the dispute would be expeditious.

### B. Former Beneficiaries

A threshold problem is determining whether plaintiffs, as former beneficiaries of the defendants' plans, have a statutory remedy under ERISA. Counts 1 and 2(A) of plaintiffs' complaint, which focus on the defendants' alleged breach of the terms of the plan, both cite language from ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)[3], permitting a beneficiary "to recover benefits due to him under the terms of his Plan

---

**3.** The statute reads: "A civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under

the terms of the plan, or to clarify his rights to future benefits under the terms of the plan ...." 29 U.S.C.A. § 1132(a)(1)(B).

...." Count 2(B), meanwhile, alleges a breach of fiduciary duty under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).[4] The turgid caselaw on point does leave in some doubt which statutory provision applies to former beneficiaries in plaintiffs' respective positions.

The key Supreme Court case comparing these two statutory provisions is *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). The *Varity* plaintiffs were former employees and retirees who were misled by their former employer into believing (wrongly) that their ERISA benefits would remain intact if they transferred to a separately incorporated subsidiary. In permitting the plaintiffs' claim for reinstatement to proceed under § 1132(a)(3), the Court opined:

> [W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate".... But that is not the case here. The plaintiffs in this case could not proceed under the *first* subsection [§ 1132(a)(1)(B) ] because they were no longer members of the ... plan and, therefore, had no "benefits due [them] under the terms of [the] plan".... They must rely on the *third* subsection [§ 1132(a)(3) ] or they have no remedy at all. We are not aware of any ERISA-related purpose that denial of a remedy would serve. Rather, we believe that granting a remedy is consistent with the literal language of the statute, the Act's purposes, and pre-existing trust law.

*Varity*, 516 U.S. at 515, 116 S.Ct. 1065 (emphases in original) (internal citations omitted).

After *Varity*, "[f]ederal courts have uniformly concluded that, if a plaintiff can pursue benefits under the plan pursuant to section a(1), there is an adequate remedy under the plan which bars a further remedy under Section a(3)." *Larocca v. Borden, Inc.*, 276 F.3d 22, 28 (1st Cir.2002) (constructively reinstating improperly terminated beneficiaries with retrospective relief under the plan terms, but denying additional disgorgement relief). In *dicta*, *Larocca* suggests that Section (a)(1) only governs remedies for those who are members of a plan at the time they filed suit. *Id.* at 29 ("The plaintiffs here were only ineligible for a remedy pursuant to Section [1132](a)(1)[ (B) ] because they were not members of the Plan *when they filed suit*.") (emphasis in original).

Moreover, a determination as to whether the claim proceeds pursuant to § 1132(a)(1) or § 1132(a)(3) could affect the scope of permissible remedies. Section 1132(a)(3) permits only suits seeking "otherwise appropriate equitable relief." The Supreme Court has read this statutory phrase parsimoniously as limiting the forms of relief to those "traditionally viewed as 'equitable' such as mandamus or injunctions and as excluding money damages." *Barrs v. Lockheed Martin Corp.*, 287 F.3d 202, 206 (1st Cir.2002) (citing *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)). Even requests for restitution are not necessarily equitable. *See Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, ——, 122 S.Ct. 708, 714–15, 151 L.Ed.2d 635 (2002) (pointing out that relief falling under the rubric of restitution can

---

4. The statute reads: "A civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan ...." 29 U.S.C.A. § 1132(a)(3).

be relief in law or relief in equity). Here plaintiffs seek compensatory damages, restitution, disgorgement, injunctive and declaratory relief arising from the alleged unlawful copayment practices. In short, what relief is available may depend not only on which statutory provision applies to each plaintiff, but also on whether each remedy sought is deemed "equitable" in the relevant statutory sense.

Although cutting through the gordian knot of the recently evolving case-law is not easy [5], the following legal conclusions emerge. Because plaintiff Stavis was a member of the plan at the time the suit was filed, he may assert a cause of action under ERISA § 502(a)(1)(B). Regardless of whether he succeeds on the merits, however, *Larocca* leaves his capacity to seek further equitable relief under (a)(3) in doubt. Meanwhile, under *Varity*, plaintiff Alves' non-membership in the plan when the suit was filed bars him from pursuing a claim under ERISA § 502(a)(1)(B). His sole avenue of relief is § 502(a)(3). The scope of potential remedies available to each plaintiff is even murkier. Under *Barrs, Mertens* and *Great–West Life*, the forms of relief available could vary between the two plaintiffs, since only one belonged to a defendant's plans when the suit was filed. As a practical matter, the Court need resolve the availability of remedies to the class only if plaintiffs succeed on at least one of their claims. Consequently, I turn next to an analysis, on the merits, of plaintiffs' claims under both statutory provisions.

## C. Breach of Plan Terms (Counts 1 and 2A)

Plaintiffs allege that defendants have breached the terms of their contract with members in violation of ERISA.

Several principles of ERISA interpretation guide this court's analysis. First, "[w]hat is 'due' to [a beneficiary] under the policy is, in the first instance, defined by the terms of the policy." *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 56 (1st Cir.1999). Second, since contract construction is a matter of law, "a district court reviews ERISA claims arising under 29 USC § 1132(a)(1)(B) *de novo* unless the benefits plan in question confers upon the administrator 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan.' " *Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 583 (1st Cir.1993) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Finally, because state law is expressly preempted by ERISA, 29 U.S.C. § 1144(a), a beneficiary's rights under the policy are governed by federal common law rather than state law. *Id.* at 585.

The third of these principles, ERISA preemption, does not substantially alter the doctrinal analysis since the relevant federal substantive law includes "common sense canons of contract interpretation" derived from state law. *Morais v. Cent. Beverage Corp. Union Employees' Supplemental Ret. Plan*, 167 F.3d 709, 712 (1st Cir.1999) (quoting *Rodriguez–Abreu*, 986 F.2d at 585) (internal citations omitted). Since "generally speaking ERISA does not mandate that a covered plan include particular substantive provisions . . . the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." *Harris v. Harvard Pilgrim Health Care*, 208 F.3d 274, 277–78 (1st Cir.2000) (quotations omitted). "[C]ourts are to construe ERISA plans by employing accepted principles of contract

---

5. Indeed, as plaintiffs point out so acidly, defendants did a complete flipflop in their briefs on which causes of action could be pursued.

and trust law .... we may not supplant [the natural meaning of ERISA plan terms] with rigid definitions or contrary interpretations offered by the parties." *Bellino v. Schlumberger Techs.*, 944 F.2d 26, 31–32 (1st Cir.1991). "In determining whether a contract interpretation is reasonable, one must consider the intent of the parties, the circumstances under which the contract was entered into and the manner in which an 'average person' would interpret the terms." *Corsini v. United Healthcare Services, Inc.*, 145 F.Supp.2d 184, 190 (D.R.I.2001) (quoting *Wickman v. Northwestern Nat. Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir.1990)).

A final pair of ERISA cases highlights the First Circuit's insistence on strict construction of ERISA plan documents, even when such an approach is inequitable with respect to particular plaintiffs. *See Harris*, 208 F.3d at 279 (declining to impose pro rata sharing of attorneys' fees as an equitable matter because plan, although it was compensated by a third party settlement without incurring any of its own attorneys' fees, did not provide for such a distribution); *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489–490 (1st Cir. 1989) ("Any time coverage is less than universal, line-drawing becomes a necessary evil.")

Each plan's documentation states the copayment amount for different categories of prescription drugs. The HPHC documentation provides, "The Copayment is $5 per prescription or per refill for up to a 30–day supply." The Member Agreements of HPHC's HMO and POS Plans both specify that copayments are "$5 per prescription or refill for those drugs listed in the Formulary" and "$10 per prescription or refill for those drugs not listed in the Formulary." Finally, a rider to the PHC Plan's Summary Plan Subscription Document states, "[p]rescription drug benefits ...shall be subject to a nine dollar ($9) copayment for brand name drugs and a three dollar ($3) copayment for generic drugs."

Plaintiffs' readings of other contractual provisions, in an effort to muddy the apparent clarity of the copayment schedule, are unpersuasive. Plaintiffs argue that the use of the word copayment clearly implies that a member's copayment is a contribution toward the cost of a covered service because the prefix "co" is commonly understood to signify a joint or shared activity. However, the term "copayment" is defined in each plan's documents as either "[f]ees payable by Members for certain Covered Services" or "[a] specific dollar amount Members pay for certain covered services." Specifically with regard to the PHC Plan, the mere use of the term "coverage" to describe drug benefits does not—as plaintiffs allege—undermine the plain meaning of the copayment schedule. Neither does the statement "[t]he Plan will pay the rest," which concludes a paragraph on prescription drug benefits, imply that the HMO's true cost invariably exceeds the copayment charged.

Plaintiffs' interpretive gloss on several provisions in the HPHC Plan Documents also does not pass muster. The statement that prescription drugs are "[c]overed in full after a $5 copayment ...[or] $10 copayment ...," for example, suggests nothing more than that coverage "kicks in" once the copayments have been made. Even if plaintiffs correctly construe the Member Agreement (which states that non-formulary drugs are "generally more expensive" than formulary drugs) as implying that the copayment amount generally is "a function of a medication's cost," this does not preclude either type costing less than the copayment amount in some instances. In fact, since there are only two copayment amounts and the actual

cost of medications is likely to vary widely, the average beneficiary could not expect an exact one-to-one correlation.

 In short, since the contract provisions of each plan specify the required copayment amounts, without making exceptions for cases where the fee exceeds the insurer's true cost, the provisions "should be given [their] natural meaning." *Burnham*, 873 F.2d at 489. As the First Circuit cautioned, "unqualified plan provisions need not explicitly rule out every possible contingency in order to be deemed unambiguous. ERISA merely requires that covered plans be sufficiently accurate and comprehensive to reasonably apprise such ... participants and beneficiaries of their rights and obligations under the plan." *Harris*, 208 F.3d at 278 (internal citations and quotations omitted).

### D. Breach of Fiduciary Duty (Count 2B)

The second question is whether defendants breached their fiduciary obligations in collecting copayments in excess of the actual cost, and in failing to disclose that practice.

#### a. *Implementation*

 As a threshold matter, the court must determine whether the defendants were acting in a fiduciary capacity when they crafted the copayment plan without alerting potential members to the possibility of "excess" payments. Defendants argue that a health benefit plan sponsor is not acting in a fiduciary capacity under ERISA when it determines the financial terms and conditions of a health benefit plan.

The ERISA statute specifies that a person is a fiduciary to the extent that she "exercises any discretionary authority or discretionary control respecting management of [the] plan," or "has any discre-

tionary authority or discretionary responsibility in [its] administration." Employee Retirement Income Security Act of 1974, § 3(21)(A), 29 U.S.C.A. § 1002(21)(A). The duties of a plan fiduciary are described in 29 U.S.C. § 1104(a)(1), which provides, in relevant part, that

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries ...

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ...

[and]

(D) in accordance with the documents and instruments governing the plan

. . . .

The duty of loyalty demands that an ERISA fiduciary not "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

 Defendants agree that they are "fiduciaries" when they exercise discretionary control respecting implementation of the plan. However, they contend that a health care plan sponsor's mere crafting of plan language governing copayment provisions does not trigger its fiduciary duty. In a related context, the Supreme Court has stated that "an employer's decisions about the content of a plan are not themselves fiduciary acts." *Pegram v. Herdrich*, 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996)). "Nothing in ERISA requires

employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefit employers must provide if they choose to have such a plan." *Lockheed*, 517 U.S. at 887, 116 S.Ct. 1783. Moreover, the mere fact that an entity is an ERISA fiduciary "does not restrict it from pursuing reasonable business behavior." *Vartanian v. Monsanto*, 131 F.3d 264, 268 (1st Cir.1997) (citation omitted).

■ Although conceding that the creation of the business terms of an ERISA plan is not a fiduciary act, plaintiffs argue that the defendants' failure to implement the plan in a way that gives plan members the benefit of negotiated discounts on the cost of prescription drugs constitutes a breach of fiduciary duty.

■ There are several flaws in this argument. First, there can be no breach of fiduciary duty where an ERISA plan is implemented according to its written, non-discretionary terms. Moreover, even if the HMOs had some discretion in implementation, the fact that the copayment sometimes exceeded the defendants' per-unit cost does not, per se, constitute a breach of fiduciary duty.[6] The named plaintiffs actually came out ahead in the copayment plan. Plaintiff Alves paid out $70 in copayments for 13 prescriptions while a member of HPHC, for which the HMO reimbursed CVS $572.14. Plaintiff Stavis paid $355 for 72 prescriptions while a member of HPHC's Added Choice plan, for which the HMO paid out $2,181.84. There is no evidence that plaintiffs' experience was anomalous. Even at in-house pharmacies, the $5 or $10 copayment charged by HPHC was far less than the average prescription cost (which ranged from $20.90 in 1995 to $38.56 in 2000).

Although plaintiffs have offered no evidence to this effect, it is certainly possible that some members of the plaintiff class experienced a "net loss" from the drug copayment plan, in the sense that their copayments over the span of coverage totaled more than the defendants' total costs. However, this still would not imply a breach of fiduciary duty, but rather the sort of reasonable line-drawing that the caselaw clearly permits. *See Burnham*, 873 F.2d at 490 ("Any time coverage is less than universal, line-drawing becomes a necessary evil.")

Plaintiffs rely heavily on so-called "80/20 cases," also involving a health insurer's alleged failure under ERISA to disclose or pass along to members discounts obtained from health care providers. In the 80/20 cases, the insurance contract required members to pay 20% of the applicable charge for each covered service. The 80/20 plaintiffs grounded their claims on the fact that the applicable "charge" used to calculate the 20% copayment exceeded the actu-

---

6. The Second Amended Complaint (¶ 77) points out: "In effect, HPHC uses the copayment paid by members of the class to reduce its costs on higher-priced prescriptions...." "Cross-subsidies," whereby the insurer's net profit from purchases of low-cost drugs helps to subsidize the large costs incurred from purchases of high-cost medications, are not uncommon in other areas of health care. *See generally* Dwayne A. Banks et. al., *Cross-Subsidization in Hospital Care: Some Lessons From the Law and Economics of Regulation*, 9 Health Matrix 1 (1999) (discussing the practice of cross-subsidization in order for hospi-

tals to care for nonpaying or underpaying patients); Jon D. Hanson & Kyle D. Logue, *The First–Party Insurance*, 76 Cornell L.Rev. 129 (1990) (noting, in context of product risk insurance, that "low-damage insureds will cross-subsidize high-damage insureds."). *Cf.* Russell Korobkin, *Determining Health Care Rights From Behind a Veil of Ignorance*, 1998 U. Ill. L.Rev. 801 (1998) (noting that a health care system involving cross-subsidization is the most equitable system, since it would be preferred by an individual who does not know his or her future state of health).

al cost to the provider of the goods or services obtained.

In *Hoover v. Blue Cross & Blue Shield of Alabama*, 855 F.2d 1538, 1543 (11th Cir.1988), the Eleventh Circuit rejected a claim that the health care insurer breached its fiduciary duty by requiring members to pay 20% of undiscounted hospital charges. Relying on an affidavit explaining that it was not practical as an administrative matter to operate a plan based on net cost, it reasoned:

> [Plaintiff] contends that the defendants' interpretation of the plan is unreasonable because the words "cost" and "charge" are interchangeable and that a beneficiary familiar with the copayment provision would fully expect that the twenty percent figure refers to the actual, total amount of money a hospital would receive for its care of that beneficiary. [Plaintiff's] argument fails to acknowledge that, under ERISA, the subjective expectations of a plan beneficiary do not provide the proper measure of a plan administrator's interpretation of a disputed plan provision.

*Id.* at 1543.

The lower courts have split on the 80/20 challenges. *Compare Everson v. Blue Cross & Blue Shield of Ohio*, 898 F.Supp. 532, 539 (N.D.Ohio 1994) (holding that one Plan Certificate, when read alone, left ambiguous whether the "reasonable charge" from which copayments are calculated reflected agreed upon discounts, and construing the ambiguity against the insurer), *McConocha v. Blue Cross and Blue Shield of Ohio*, 898 F.Supp. 545, 551 (N.D.Ohio 1995) (finding a breach of fiduciary duty for failure to disclose a discounting scheme), and *Corsini*, 145 F.Supp.2d at 191–92 (holding that an HMO's method of calculating 20% copayments as a percentage of "Eligible Expenses," as opposed to discounted fees actually paid, violated the terms of the Plan under 29 U.S.C. § 1132(a)(1)(B)), *with Lefler v. United HealthCare of Utah, Inc.*, 162 F.Supp.2d 1310, 1323 (D.Utah 2001) (holding that under a deferential standard of review, HMO acted reasonably under ambiguous plan terms by pegging co-pay percentage to full, undiscounted amounts). *See also Ries v. Humana Health Plan, Inc.*, 1995 WL 669583, *7 (N.D.Ill.1995) (finding a breach of fiduciary duty where, under a reimbursement provision, an HMO put a $8,947 lien on a member's settlement award for treatment of her injuries from a car accident although it settled her medical bills for just $600).

Plaintiffs' reliance on the 80/20 cases is misplaced. A prospective member surveying the plan documents in the 80/20 cases could not predict the cost of prescription medications without first being told how the "reasonable" or "eligible" charge (of which they would be required to shoulder a 20% share) would be calculated. In contrast, the copayment provisions of defendants' plans do not mislead the "average person," because they unambiguously specify how much a prospective member must pay for future medications. *Corsini*, 145 F.Supp.2d at 190.

In sum, I conclude that the defendants did not breach their fiduciary duties by charging a flat copayment amount, even though this policy could disadvantage some beneficiaries some of the time. "That a seeming inequity may result on occasion is not fatal to the plan's legitimacy: after all . . . 'the necessity to draw hard boundary lines, inevitably adversely affects some individuals who find themselves on the wrong side of a line.'" *Burnham*, 873 F.2d at 490 (quoting *Rueda v. Seafarers Int'l Union of N. Am.*, 576 F.2d 939, 942 (1st Cir.1978)).

### b. *Affirmative misrepresentations*

 Plaintiffs also argue that defendants made affirmative misrepresentations to plan beneficiaries about copayments. It is well settled that "[t]o participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is . . . inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity*, 516 U.S. at 506, 116 S.Ct. 1065 (collecting cases).

 To begin with, plaintiffs' argument that the terms of the plan and related documents, in and of themselves, contain affirmative misrepresentations is no more credible in support of the theory that defendants breached their fiduciary duty than it was in support of the theory that defendants breached the terms of the contract. However, plaintiffs also point to evidence that the receipts dispensed at HVMA in-house pharmacies listed the "retail value" of the prescription medication without disclosing the defendants' actual costs. This tactic was allegedly employed to deceive plaintiffs into believing that all prescription medications cost more than the stated copayment.[7] Defendants, meanwhile, counter that retail values were calculated because some individuals to whom they dispensed medication were not eligible for prescription drugs benefits.

Defendants have the better of this argument. The evidence suggests that the receipt, purporting to compare the copayment and "retail value" of each medication, does in fact provide precisely such a comparison. Plaintiffs argue that the receipt's failure to list a wholesale price alongside the copayment and retail values implies that the HMO purchases medicine at retail. Even if an unwary beneficiary might make such a hasty assumption, this falls far short of an affirmative misrepresentation. It is worth repeating the First Circuit's admonition that "unqualified plan provisions need not explicitly rule out every possible contingency in order to be deemed unambiguous. ERISA merely requires that covered plans be sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations . . . ." *Harris*, 208 F.3d at 278 (internal citations and quotations omitted). *See also Hoover*, 855 F.2d at 1542 (subjective expectations of beneficiaries is wrong yardstick for measuring plan administrator's interpretation of a disputed plan provision).

### c. Affirmative duty to disclose

 Plaintiffs contend that under ERISA's disclosure requirements, defendants were affirmatively required to disclose that "for some medications, the copayment amount would actually exceed HPHC's cost."[8] This argument finds some support in the 80/20 cases, some of which impose an affirmative duty to disclose discounting arrangements to a beneficiary. *See e.g. McConocha*, 898 F.Supp. at 551 ("The presence of a discount scheme which increases the copay percentage is a material fact about which plaintiffs should have been told.")

---

7. The "retail" price of an item is defined as its sale "to ultimate consumers for personal or household consumption," *Merriam–Webster's Collegiate Dictionary* 999 (10th ed.1993), in contra-distinction to a "wholesale" price, which applies to "the sale of commodities in quantity usu[ally] for resale (as by a retail merchant) . . . ." *Id.* at 1351.

8. To support their theory that defendants failed to disclose material facts, plaintiffs claim that some other health insurers, such as Tufts Healthcare and HMO Blue, require their members to pay the lesser of the copayment amount and the cost to the insurer of the prescription.

Under the ERISA statute, plan administrators must furnish various forms of information to plan beneficiaries. *See* 29 U.S.C. § 1024(b) (requiring a plan administrator to furnish summary plan descriptions and annual reports); 29 U.S.C. § 1022(a) (requiring notice of "any material modification in the terms of the plan"); 29 U.S.C. § 1025(a) (requiring various other disclosures in response to requests). Department of Labor Regulations require that the summary plan description document include a description of "cost sharing provisions, including ... copayment amounts for which the participant or beneficiary will be responsible." *See* 29 C.F.R. ¶ 2520.102–3(j)(3). However, there is no statutory or regulatory requirement to disclose plan costs.

The Supreme Court so far has declined to delineate the precise scope of an HMO's affirmative disclosure obligations under ERISA. In *Varity,* the Supreme Court expressly declined to reach the question of "whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries." 516 U.S. 489, 506, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). In *Pegram,* the Court again reserved the question of whether the HMO had a fiduciary obligation to "disclose physician incentives to limit care" if such information could "affect[ ] beneficiaries' material interests." 530 U.S. at 228, n. 8, 120 S.Ct. 2143.

Caselaw from lower courts underscores the amorphous quality of the fiduciary duty to disclose information over and above that required by ERISA statutes and regulations. The First Circuit has dealt on occasion with the fiduciary duty to disclose information. *See Vartanian,* 131 F.3d at 272 (holding that mere "corporate ruminations" about offering an enhanced severance package to certain employees did not trigger a contemporaneous duty to disclose); *Rodriguez–Abreu,* 986 F.2d at 589 (holding that an employer's failure to timely provide written materials to plan participants upon written request did not necessarily give rise to statutory penalties). Most recently, in *Barrs,* the First Circuit held that the employer of the plaintiff's ex-husband had no fiduciary duty to inform her that her ex-husband had made a substitution in a life insurance policy of which she had been the designated beneficiary. 287 F.3d at 207–08. The *Barrs* court opined:

> Absent a promise or misrepresentation, the courts have almost uniformly rejected claims by plan participants or beneficiaries that an ERISA administrator has to volunteer individualized information taking account of their peculiar circumstances. This view reflects ERISA's focus on limited and general reporting and disclosure requirements ... and also reflects the enormous burdens an obligation to proffer individualized advice would inflict on plan administrators.

*Id.* (footnote omitted). *But see Bixler v. Cent. Penn. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1302–3 (3d Cir.1993) (finding a breach of fiduciary duty where an employer failed to inform the wife of a sick employee about the availability of reimbursement for medical expenses when she inquired about death benefits); *Eddy v. Colonial Life Ins. Co. of Am.,* 919 F.2d 747, 751 (D.C.Cir.1990) (holding that an ERISA fiduciary not only could not misinform an HIV-positive beneficiary in urgent need of an operation about his health insurance status when asked, but "also had an affirmative obligation to *inform*—to provide complete and correct material information on [his] status and options.")

In one analogous context, the Fifth Circuit has held that, absent an individualized inquiry or other "special circumstance," an HMO has no broad affirmative duty to disclose the existence of financial incentives that encourage physicians to control costs. *See Ehlmann v. Kaiser Found. Health Plan of Tex.*, 198 F.3d 552, 556 (5th Cir.2000). Where there has been an individualized inquiry by a plan member, the Eighth Circuit has held that such disclosure must be made. *See Shea v. Esensten*, 107 F.3d 625, 629 (8th Cir.1997) (holding that defendant HMO had a duty to disclose physician's financial incentives to minimize the use of physician referrals and other specialty services when a plan participant asked his doctor whether he should see a heart specialist, was told not to, and then died).

■■■■■ Courts must apply common law trust standards in determining the scope of an ERISA's fiduciary obligations, bearing in mind the special nature and purpose of ERISA benefit plans. *Varity*, 516 U.S. at 506, 116 S.Ct. 1065. An affirmative fiduciary duty arises under common law trust doctrine to communicate "material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection ...." *Restatement (Second) of Trusts* § 173, cmt. d (1959). Here, there is no evidence of the usual hallmarks of breach of fiduciary duty: intentional misrepresentation, bad faith failure to protect the financial integrity of the plan, or a failure to provide material information in response to a direct inquiry.

Plaintiffs maintain, however, that a beneficiary is harmed by defendants' failure to disclose the comparison between the co-payments and actual costs. It is true that beneficiaries might like to know about the existence and magnitude of discounting agreements, so that they could determine whether—and to what degree—a plan directly passes on such discounts to its members. However, neither Congress nor the Department of Labor has mandated this type of disclosure. As the Sixth Circuit has opined, "[i]t would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed." *Sprague v. General Motors Corp.*, 133 F.3d 388, 405 (6th Cir.1998) (quoted in *Ehlmann*, 198 F.3d at 554).

### d. Self-dealing

■■■■ The final prong of plaintiffs' breach of fiduciary duty claim under 19 U.S.C. § 1132(a)(3) alleges that defendants breached their duty of loyalty under 20 U.S.C. § 1106(b)(1), prohibiting ERISA fiduciaries from "deal[ing] with the assets of the plan in [their] own interest or for [their] own account." This rule bars transactions "tainted by a conflict of interest and thus highly susceptible to self dealing." *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir.1987).

The caselaw suggests that violations of 20 U.S.C. § 1106(b)(1) generally involve an ERISA fiduciary's use of plan assets for personal profit, gain or advantage. *See, e.g., Leigh v. Engle*, 727 F.2d 113, 124 (7th Cir.1984) (finding § 1106(b)(1) violation where ERISA administrators invested plan assets in firms involved in corporate control contests, even though administrators themselves were actively involved in and had financial interests in the control contests); *Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir.2001) (finding breach of § 1106(b)(1) where ERISA fidu-

ciary marked up premiums charged to beneficiary, set his own administrative fees and collected them himself from plan assets, and failed to account for two benefits checks made payable to the plan); *Felber v. Estate of Regan*, 117 F.3d 1084, 1086–87 (8th Cir.1997) (finding § 1106(b)(1) violation where ERISA fiduciary used plan assets to repay bridge loan obtained to finance personal purchase of real property); *Srein v. Soft Drink Workers Union Local 812*, 93 F.3d 1088, 1097–98 (2nd Cir.1996) (finding breach of § 1106(b)(1) where insurer paid broker's commission out of ERISA reserve fund, and also withheld monies in reserve fund to extract concessions from plan that would benefit it in litigation with broker); *New York State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 183 (2d Cir.1994) (finding breach of § 1106(b)(1) where ERISA fiduciary hired summer employees of fund's attorney as maintenance men at the fund's building for the rest of the year); *Lowen*, 829 F.2d at 1214 (finding breach of § 1106(b)(1) where ERISA fiduciary invested plan assets in companies in which it had a substantial equity interest); *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir.1988) (finding breach of § 1106(b)(1) where ERISA fiduciary with ownership interest in corporation soliciting business for dental program personally profited by influencing local unions to join the program).

 There is no evidence that any defendant sought personal gain or advantage—even indirectly—from the copayment provisions. The mere fact that defendants used discounting arrangements to reduce their net cost of providing prescription drug benefits does not constitute self-dealing proscribed by 20 U.S.C. § 1106(b)(1).

### e. Claims against HVMA

 HVMA argues that as a medical service provider under contract to HPHC, as opposed to an HMO sponsor, it has no contractual relationship with either named plaintiff, and cannot be held liable unless it "knew or should have known" of the HMO's breach of fiduciary duty and received "ill-gotten . . . assets" as a result. *See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000). The Court allows HVMA's motion for summary judgment on the grounds that there is no evidence supporting either factual predicate.

### *ORDER*

For the foregoing reasons, the defendants' motion for summary judgment (Docket No. 69) is ***ALLOWED*** with respect to all claims.[9]

---

9. Plaintiffs bring three additional claims: unjust enrichment (Count 3); Equitable Remedies under ERISA (Count 4); and Declaratory Relief (Count 5). (Pl. Sec. Am. Class Act. Compl. at 33–36). Given this court's findings that defendants breached neither its contractual nor fiduciary obligations under ERISA, and that plaintiffs suffered no cognizable injury, these claims are summarily denied.