In re **EATON VANCE CORPORATION SECURITIES LITIGATION**

No. CIV. A. 01–10911–EFH.

United States District Court, D. Massachusetts.

June 11, 2002.

Jeffrey A. Klafter, Bernstein, Litowitz, Berger & Grossman, New York City, Thomas G. Shapiro, Shapiro, Haber & Urmy LLP, Boston, MA, Steven E. Cauley, Cauley, Geller, Bowman & Coates, Little Rock, AK, Rochelle Feder Hansen, Bernstein Litowitz Berger & Grossmann, New York City, Joel H. Bernstein, Christopher J. Keller, Goodkind Labaton Rudoff & Sucharow LLP, New York City, Paul J. Geller, Cauley Geller Bowman & Coates, LLP, Jack Reise, Cauley Geller Bowman & Coates, LLP, Boca Raton, FL, John Lawlor, Mineola, NY, The Nolan Law Firm, New York City, for Plaintiffs.

Charles Lee Eisen, Glenn R. Reichardt, Kirkpatrick & Lockhart, Washington, DC, Aimee E. Bierman, Kirkpatrick & Lockhart LLP, D. Lloyd Macdonald, Kirkpatrick & Lockhart, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER

HARRINGTON, Senior District Judge.

The plaintiffs filed an amended class action complaint (Docket No. 36) alleging that the defendants [1] made false and mis-

---

1. The defendants in this action are Eaton Vance Corporation, EV Classic Senior Floating Rate Fund, Eaton Vance Prime Rate Reserves, Eaton Vance Institutional Senior Floating–Rate Fund, Eaton Vance Advisors Senior Floating Rate Fund, Boston Manage-

leading statements in registration statements in violation of Sections 11(a), 12(a)(2) and 15 of the Securities Act of 1933 (Counts I–III), and engaged in a scheme to defraud the public by making false and misleading statements in violation of Section 10(b) and Rule 10b–5 (Count IV), and Section 20(a) (Count V) of the Securities Exchange Act of 1934 between May 25, 1998 and March 5, 2001 (the "class period"[2]). The defendants move to dismiss Counts IV and V under Fed.R.Civ.P. 12(b)(6) because the plaintiffs have failed to comply with the heightened pleading requirements for securities fraud under the Private Securities Litigation Reform Act (the "Reform Act"), 15 U.S.C. § 78u–4(b) (1997), and under Fed.R.Civ.P. 9(b). The Court agrees, and dismisses Counts IV and V from the amended complaint.

## I. *BACKGROUND*

The facts are taken from the amended complaint and the documents integral to or incorporated in the amended complaint. *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir.1996).

Defendant Eaton Vance Corporation is an investment management company that operates a number of mutual funds, including the defendant funds EV Classic Senior Floating Rate Fund, Eaton Vance Prime Rate Reserves, Eaton Vance Institutional Senior Floating–Rate Fund, and Eaton Vance Advisors Senior Floating Rate Fund (the "Funds"). Complaint ¶ 15. The Funds are registered under the Investment Company Act of 1940, 15 U.S.C. § 80a *et seq.* (the "1940 Act") as non-diversified, closed-end management investment companies, and the Funds' shares are not publicly traded. ¶ 30. The Funds are administered by Defendant Eaton Vance Management, a wholly-owned subsidiary of Defendant Eaton Vance Corporation. The stated investment objective of the each of the Funds is to "provide as high a level of current income as is consistent with the preservation of capital, by investing all of its investable assets in senior secured floating rate loans." ¶ 31.

The assets of each of the Funds are invested in a single loan portfolio (the "Portfolio") managed by Defendant Boston Management and Research ("BMR"). ¶¶ 21, 31. BMR is a wholly-owned subsidiary of Defendant Eaton Vance Management. ¶ 21. The Portfolio invests in senior loans made to corporations, partnerships and other business entities with floating rates of interest, meaning that the rates are adjusted periodically to reflect current interest rates. ¶ 32. Senior loans have primary standing among other debt held by a given borrower, meaning they must usually be repaid before other debt obligations. ¶ 32. The vast majority of the Portfolio's loans are purchased as assignment interests from another lender or as a participating member of a loan syndicate along with other financial institutions. ¶ 33. The prospectuses state that "[b]ecause of the protective features of Senior Loans (being senior in a borrower's capital structure and secured by specific collateral), the investment adviser believes, based on its experience, that Senior Loans tend to have more favorable loss recovery rates compared to most other types of below investment grade debt obligations." ¶ 34. The Funds are managed by the defendant

---

ment and Research, Eaton Vance Management, James B. Hawkes, James L. O'Connor, Scott H. Page, Payson F. Swaffield, M. Dozier Gardner, Jessica M. Bibliowicz, Donald R. Dwight, Samuel L. Hayes, Norton H. Reamer, Jack L. Treynor, Lynn A. Stout and John L. Thorndike.

2. Although the term "class period" is used, no class has been certified at this time.

trustees, who are responsible for the overall management and supervision of the funds.

The Funds are closed-end, interval funds that operate in accordance with SEC Rule 22c–3 under the 1940 Act. This means that the Funds continuously sell shares to the public, but unlike open-end mutual funds, only repurchase shares once per quarter. ¶ 36. These purchases and sales must be made at Net Asset Value ("NAV"), which is computed by subtracting a fund's liabilities from its total assets and dividing the result by the number of shares outstanding. Because the Funds invest exclusively in the Portfolio, the NAV of the Funds is based upon the value of the Portfolio. The value of the Portfolio is determined by the value of the Portfolio's total assets minus the Portfolio's liabilities. Thus, the NAV of the Funds hinges on how the assets of the Portfolio are valued. ¶ 37. There are two general methods that can be used to value the assets in the Portfolio. For securities and assets for which market quotations are readily available, the value shall be the market value of those securities. ¶ 38. This methodology is called the "mark-to-market" methodology. If market quotations are not readily available, then the assets shall be valued at fair value as determined in good faith by the board of directors. ¶ 38. This methodology is called the "fair value" methodology.

In the period between 1995 and 1998, prior to the class period, trading in the secondary, over-the-counter market in senior loan interests increased from $35 billion in annual volume to over $110 billion. During this period, the Prospectuses issued by the Funds stated that "Because Loan Interests are not actively traded in a public market, BMR, following procedures established by the Portfolio's Trustees, will value the Loan Interests held by the Portfolio at fair value." [3] ¶ 41. During the class period, the defendants began to value some loans using the mark-to-market methodology. ¶ 49. By the end of the class period, the defendants valued 90 percent of their loans using the mark-to-market methodology. ¶ 55.

The plaintiffs point to a number of statements in prospectuses, annual reports and other public disclosures during the class period which they allege were fraudulent. These allegations fall into four categories. The plaintiffs allege that the defendants misrepresented the availability of market prices, so that they could continue to use the fair value method of calculating NAV. They allege that the defendants also misrepresented the impact that the conversion from fair value pricing to market pricing would have on the NAV of the Funds. They further allege that even if it were proper to use the fair value methodology, the defendants improperly calculated the fair value of the loans when using that methodology. Finally, the plaintiffs allege derivatively that because of the above misrepresentations, the NAVs of the funds were inflated and were therefore themselves a misrepresentation, and that the Funds failed to disclose that the calculations were made in violation of SEC rules.

## II. *EXCHANGE ACT CLAIMS*

The Reform Act was enacted in 1995 to limit abuse in private securities lawsuits. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 (1st Cir.1999). It imposed a pleading requirement for all private securities actions arising under 15 U.S.C. §§ 78a *et seq.* which is "congruent and consistent" with the First Circuit's preexisting Rule 9(b) jurisprudence in securities fraud cases. 15 U.S.C. § 78u–4(b); *Greebel*, 194

---

**3.** This is not alleged to be a misrepresenta- tion, since it is outside the class period.

F.3d at 193. To survive a motion to dismiss, a complaint alleging securities fraud must (1) specify each statement alleged to have been misleading, including its time, place and content; (2) provide factual support for the claim that the statement is misleading; and (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir.2002). Then, the complaint must, with respect to each act or omission, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2). Although the pleading requirements are heightened, the Court must still draw all reasonable inferences in the plaintiffs' favor from the facts pleaded with particularity. *Aldridge,* 284 F.3d at 78. The defendants argue that Count IV under Section 10(b) of the Exchange Act and derivative Count V under Section 20(a) of the Exchange Act should be dismissed because the plaintiffs have failed to satisfy the stringent pleading requirements imposed by the Reform Act and Rule 9(b).

A. *The Alleged Fraudulent Statements*

(1) *Failure to Use the Mark-to-Market Methodology*

The plaintiffs allege that the defendants fraudulently inflated the NAVs of the Funds by refusing to use market prices to value the Portfolio's assets when the market was sufficiently liquid to do so. As noted above, the Funds must be bought and sold at their NAV. In part, this requires the Funds to determine the total value of the assets each holds in the Portfolio. There are two valuation methodologies which are used to value the Portfolio's assets. With respect to securities for which market quotations are readily available, the value is the market value of those securities. 15 U.S.C. § 80a–2(a)(41)(B)(i) (1997). With respect to other securities and assets for which market quotations are not readily available, the value is fair value as determined in good faith by the board of directors. 15 U.S.C. § 80a–2(a)(41)(B)(ii).

In 1970, in Accounting Series Release 118 ("ASR–118"), cited in the plaintiff's complaint, the SEC elaborated on the standard for determining when market quotations are readily available such that the mark-to-market methodology must be used:

> If the validity of the quotations appears to be questionable, or if the number of quotations is such as to indicate that there is a thin market in the security, further consideration should be given to whether "market quotations are readily available." If it is decided that they are not readily available, the security should be considered one required to be valued at "fair value as determined in good faith by the board of directors."

Def.App. 7 at *10. The SEC provided further guidance on this matter in a December 8, 1999 letter to the Investment Company Institute and its members, including Eaton Vance: "When the exchange or market on which a security is traded does not open for trading for an entire trading day, and no other market prices are available, we believe that market quotations for that security are no longer 'readily available.'" ¶ 49; Def.App. 8 at 3.

(a) *Prospectuses Prior to December 1999*

The plaintiffs allege that the defendants made several false or misleading statements with respect to the market for senior loans, leading investors to believe that market prices were not readily available, when in fact they were. Some of these statements were contained in pro-

spectuses issued during the class period and prior to December 1999.[4] ¶ 47. These prospectuses characterized senior loan interests held in the portfolio as relatively illiquid, for which quotes on the senior loan market were not reliable, and stated that the defendants would be using the fair value methodology to value the loans. ¶ 48.

The plaintiffs state that these statements were false because market quotations were readily available. However, the plaintiffs do not plead facts that show how the availability of loan price quotations in the senior loan market during the class period meets the standards for determining that market quotations are readily available as set forth in ASR–118 and the December 8, 1999 SEC letter. The complaint states that other senior loan funds had found the senior loan market active and reliable enough to calculate their NAVs on a mark-to-market basis throughout the class period, including Merrill Lynch Asset Management, which had used market pricing to value the loans it holds since its inception in 1989. ¶ 41. There is no factual basis for concluding that these companies were themselves properly calculating NAV in accordance with SEC rules, and even if they were, there is no basis for concluding that the market for the loans held by these other companies was comparable to the market for the loans in the Portfolio.

The plaintiffs also state that according to the Loan Syndication and Trading Association ("LSTA"), the loan market was more active in 1998 than 1999, when the defendants purported to adopt market pricing. ¶ 42. The Loan Pricing Corporation ("LPC"), which provides customers with pricing and other information on loans via a subscription service, was a well known source of loans. ¶ 43. The LPC's website advertises its "13–year track record of collecting and distributing high quality bank loan prices in an efficient and secure manner." ¶ 43. The LSTA was another source for loan prices during the class period, having formed in 1995 to improve uniformity of pricing and procedures in the secondary loan market. ¶ 43. The plaintiffs also cite six companies for which loans traded at less than the defendants' valued loans to the same companies at various times during the class period. ¶ 44.

Assuming all of these facts are true, and drawing all inferences in favor of the plaintiffs, there are still no allegations regarding the volume or frequency of trading that would satisfy the Reform Act/Rule 9(b) standards for alleging that market quotations were "readily available" within the guidelines set forth by the SEC. These facts merely show that price quotations existed, not that they were a reliable basis for valuing the Portfolio's assets and the price at which shares of the Funds would be bought and sold. The existence of *accurate* price quotations does not in any way suggest that the market was sufficiently *liquid* to mark-to-market. Indeed, the December 8, 1999 SEC letter contemplates that if the market for securities is closed for even a single day, then market quotations are not readily available, and the fair value methodology must be used. This is true even if that morning's paper provides perfectly accurate price quotations from the day before. The plaintiffs have made no attempt to allege that the pricing services they refer to provide quo-

---

4. These prospectuses were published on March 30, 1998, October 19, 1998 and February 22, 1999 for the EV Classic Senior Floating–Rate Fund; April 1, 1998, November 2, 1998 and May 3, 1999 for the Eaton Vance Prime Rate Reserves; May 3, 1999 for the Eaton Vance Institutional Senior Floating–Rate Fund; and March 20, 1998, November 2, 1998 and May 3, 1999 for the Eaton Vance Advisers Senior Floating–Rate Fund.

tations with sufficient timelines, or that the transactions reported therein occur with sufficient frequency, to mark-to-market the loans in the Portfolio. They only allege that pricing services existed, and that the prices listed in those services were accurate for the transactions reported.

The defendants' public filings and statements acknowledged that a secondary market for senior loans existed. For example, the October 19, 1998/November 2, 1998 prospectuses for each of the Funds[5] stated that:

> Senior Loans, at present, are generally not readily marketable and are subject to restrictions on resale. Interests in Senior Loans generally are not listed on any national securities exchange or automated quotation system and no active trading market may exist for many of the Senior Loans in which the Portfolio will invest. Where a secondary market exists, such market may be subject to irregular trading activity, wide bid/ask spreads and extended trade settlement periods. Senior Loans are thus relatively illiquid, which illiquidity may impair the Portfolio's ability to realize the full value of its assets in the event of a voluntary or involuntary liquidation of such assets.

It is also clear from the prospectuses and supplements that the defendants were not using transactions in the secondary market as the sole basis for valuing the loans in the Portfolio. Therefore, the assertion in the complaint that price quotations existed does not even truly contradict what the defendants disclosed. As such, this allegation does not meet the requirements of the Reform Act and Rule 9(b) because it provides no basis to conclude that the prospectuses issued prior to December 1999 falsely stated the availability of reliable market quotations for senior loans.

### (b) *1999 Annual Reports*

■ Similar allegations of fraud are insufficient for much the same reason. In a question-answer session in the 1999 annual reports for the Funds, published on or about February 28, 2000, Defendant Page, a manager of each of the Funds and the Portfolio, stated that the funds would be moving to market prices for loans that are sufficiently liquid to be marked-to-market. ¶ 49. He explained that initially this new valuation procedure would affect about 10 percent of the Portfolio, and may rise over time as they identified additional loans that could be priced at market value. ¶ 49. The plaintiffs assert that this statement is false because at this point, market prices were readily available for significantly more than 10 percent of the loans. ¶ 53. As explained above, the plaintiffs plead no basis for concluding that market prices were readily available for more than 10 percent of the loans under the applicable SEC guidelines, so this allegation fails to meet the pleading requirement.

### (c) *March, 2000 Prospectuses*

Prospectuses issued for each of the Funds in March, 2000 stated that loans for which reliable market quotations were readily available were marked-to-market daily. ¶ 51. The plaintiffs allege that these statements are false because the majority of loans were still being priced under the fair value methodology, despite the existence of readily available market quotations for these loans. ¶ 52. Again, the plaintiffs do not plead a factual basis for concluding that the loans not marked-to-market at this time were sufficiently liquid as defined by the SEC, so this allegation does not meet the Reform Act/Rule 9(b) pleading requirement.

---

**5.** Except the EV Institutional Fund, which did    not come into existence until May 1999.

### (d) *2000 Annual Reports*

■ The plaintiffs also allege that the 2000 annual reports for the Funds [6] contained the following false statement:

In the fall of 1999, a pricing service for the secondary market trading of bank loans emerged under the auspices of the [LSTA]. In a joint venture with [LPC], a subsidiary of Reuters, LSTA/LPC began the systematic collection and reporting of indicative secondary market prices for bank loans. Prior to this service, few standards existed for soliciting and distributing price information, and those that were available were not sufficiently reliable to serve as the basis of pricing and transacting bank loans on a daily basis.

After an intensive evaluation of the new LSTA/LPC service, the Portfolio's Trustees adopted the use of this independent pricing service for a portion of the Portfolio. Throughout 2000, we continued to evaluate the reliability of the service, comparing its prices with actual transactions in loan interests that we and other institutional investors conducted. As we grew more comfortable with its reliability, based on the evaluation of data, we increased our reliance on the pricing service. Today, over 90% of the Portfolio is priced using this service and we expect that percentage to increase.

¶ 55. The plaintiffs assert that this statement is false because it states that readily available market quotations had only come into existence in the fall of 1999 as a result of the LSTA/LPC joint venture. ¶ 57. The plaintiffs' assertion is partially contrary to the defendants' statement itself, which states that quotations existed prior to the LSTA/LPC joint venture, but that they were not sufficiently reliable. The plaintiffs do not assert that the prior price quotations were sufficiently reliable, and have thus again failed to adequately plead the reasons why the statement is false.

■ The plaintiffs also assert that the 2000 annual reports demonstrated that there were readily available market quotations in 1999 which defendants did not utilize in valuing the assets of the Funds, as they should have. ¶ 57. The plaintiffs are charging the defendants with failing to recognize in 1999 that the result of their evaluation of the reliability of the LSTA/LPC joint venture would be that 90 percent of the loans were able to be marked-to-market, and attributing that failure to fraud. This is an allegation of "fraud by hindsight," and is not sufficient to state a claim under the Reform Act or Rule 9(b). *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 991 (1st Cir.1996); *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 367 (1st Cir.1994); *In re Boston Tech. Inc. Sec. Litig.*, 8 F.Supp.2d 43, 58 (D.Mass. 1998).

### (2) *The Impact of the Conversion from Fair Value to Mark-to-Market Pricing*

■ The plaintiffs assert that the defendants also misrepresented the impact the conversion from fair value to mark-to-market valuation would have on the Funds' NAVs. The plaintiffs point to a statement by Defendant Page in the 1999 annual reports of the Funds that improved liquidity and mark-to-market pricing would be "a very positive development for the market and the Fund." ¶ 49. The plaintiffs assert that this statement is false because the NAV would undeniably drop during the

---

**6.** Published March 2, 2001 for the EV Senior Classic Floating–Rate Fund, Eaton Vance Prime Rate Reserves, and Eaton Vance Institutional Senior Floating–Rate Fund, and March 5, 2001 for the Eaton Vance Advisers Senior Floating–Rate Fund.

conversion to market pricing. However, the plaintiffs have not pleaded a factual basis for concluding that it was apparent at the time these statements were made that the Funds' NAVs would undeniably drop during the conversion to market pricing.

The plaintiffs also allege that the defendants, in a December 20, 1999 mailing to dealers in shares of the funds, stated falsely that "This change [from Fair Value valuation to mark-to-market] has had no impact on [the Portfolio's] net asset value." They allege that this statement was false and misleading because the NAV of the Funds had already dropped by an unprecedented amount, from a few cents under $10.00 to about $9.87, as a result of the defendants' conversion of 10 percent of the portfolios to market pricing, and it was certain to drop even further as more of the loans were marked-to-market. ¶ 54. As noted above, there is no pleaded factual basis for concluding that the NAVs were certain to drop even further as more of the loans were marked-to-market. The remainder of the allegation is also insufficient to plead fraud with particularity. What the plaintiffs have pleaded is that the defendants said the conversion from fair value to mark-to-market in the valuation of ten percent of the loans in the Portfolio had no change on the Funds' NAVs, but during the previous year the NAVs had changed. If this were enough to plead fraud with particularity, any statement that a particular factor has had no effect on the price of any security would give rise to an automatic fraud claim, unless the price of the security remained completely static. This would defeat the purpose of the Reform Act and Rule 9(b).

In the 1999 Year–End Review that accompanied the December 20, 1999 letter, the defendants acknowledged that the NAV had declined by nine cents that year. This decline was greater movement than usual for the Funds' NAVs, and the defendants attributed this to an overall rise in default rates in the corporate bond and loan market. The plaintiffs plead no factual basis for concluding that the defendants' proffered reasons for the decline in NAV were false.

### (3) *Failure to Discount Loans Under the Fair Value Methodology*

■ The plaintiffs also allege that, even if the defendants had properly determined that the market was not sufficiently liquid to mark-to-market, the defendants' representations that they valued the Loans at fair value were themselves false and misleading. ¶ 44–48. These representations were made in prospectuses during the class period and prior to December 1999.[7] ¶ 47. The plaintiffs assert that these prospectuses were misleading because they failed to disclose the basis for their fair value analysis, which would have indicated that the NAV of the Funds was materially overstated, because it bore no relationship to what would be realized on a current sale of the Loans. ¶ 48.

ASR–118 states that with respect to "fair value" pricing:

No single standard for determining "fair value . . . in good faith" can be laid down, since fair value depends on the circumstances of each individual case. As a general principle, the current "fair value" of an issue of securities being valued by the Board of Directors would

***

**7.** These prospectuses were published on March 30, 1998, October 19, 1998 and February 22, 1999 for the EV Classic Senior Floating–Rate Fund; April 1, 1998, November 2, 1998 and May 3, 1999 for the Eaton Vance Prime Rate Reserves; May 3, 1999 for the Eaton Vance Institutional Senior Floating–Rate Fund; and March 20, 1998, November 2, 1998 and May 3, 1999 for the Eaton Vance Advisers Senior Floating–Rate Fund.

appear to be the amount which the owner might reasonably expect to receive for them upon their current sale.

Def.App. 8 at *11–12. The prospectuses state the basis for the Funds' fair value calculations. The factors disclosed in the prospectuses include:

(i) the characteristics of and fundamental analytical data relating to the Senior Loan, including the cost, size, current interest rate, period until next interest rate reset, maturity and base lending rate of the Senior Loan, the terms and conditions of the Loan and any related agreements, and the position of the Loan in the Borrower's debt structure; (ii) the nature, adequacy and value of the collateral, including the Portfolio's rights, remedies and interests with respect to the collateral; (iii) the creditworthiness of the Borrower, based on an evaluation of its financial condition, financial statements about the Borrower's business, cash flows, capital structure and future prospects; (iv) information relating to the market for the Senior Loan, including price quotations (if considered reliable) for and trading in the Senior Loan and interests in similar Senior Loans and the market environment and investor attitudes towards the Senior Loan and interests in similar Senior Loans; (v) the reputation and financial condition of the Agent and any immediate participants in the Senior Loan; and (vi) general economic and market conditions affecting the fair value of the Senior Loan.

In addition to this disclosed fair value methodology, the valuation assigned to each and every loan in the Portfolio was fully disclosed in the Funds' annual and semiannual reports. For each loan, the reports disclose the principal amount, the maturing date, and the value the Funds attributable to that loan. The prospectuses also warned that the loans were not generally marketable and subject to restrictions on resale, and that these factors might impair the Portfolio's ability to realize the full value of the assets in the event of a liquidation.

The plaintiffs plead no basis for concluding that the factors used in determining fair value outlined in the prospectuses would not be permissible under the SEC guidelines, and further plead no sufficient basis for concluding that the trustees were not following these stated procedures in arriving at the valuations disclosed in the Funds' annual and semi-annual reports. The facts the plaintiffs do plead are vague and conclusory: that the defendants ignored the Asian financial crisis, an eroding debt market, the Long Term Capital debacle, high loan defaults, and a reportedly depressed market for publicly traded loan funds, and that a proper fair value analysis would have taken these factors into account, since full value cannot be realized on a current sale when the market for the loan is depressed or nonexistent. ¶ 45. This vague allusion to a failure to account for adverse market conditions is not sufficient to plead fraud, and is more an accusation of poor management, which is not the subject of federal securities laws. *Shaw*, 82 F.3d at 1206.

The plaintiffs argue that a loan can never be priced at par using the fair value method because the lack of a liquid market for the loan necessarily means that a current sale of the loan would not result in full value. ¶ 46. Instead, a liquidity discount must be given, reflecting that a seller would always have to accept less than face value to find a buyer for a loan for which no market exists. ¶ 46. The complaint makes no attempt to apply this accounting principle to the types of loans held by the Portfolio or to the disclosures made in the prospectuses and annual re-

ports. The plaintiffs are correct in asserting that in all but a few cases, the value the Funds assigned to each loan is equal to the principal of the loan, but this fact is disclosed with striking clarity, as is the risk of loss in the event of a liquidation. *Cf. Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5–7 & n. 1 (2d. Cir.1996) (complaint dismissed because prospectuses fully disclosed actual initial investments and warned investors of the risks plaintiffs claim were not disclosed). While the valuation principle cited by the plaintiffs sounds reasonable in a general sense, ASR–118 contemplates that value can be determined fairly in more than one way. Def.App. 7 at *7, 11–12. The general principle stated by the plaintiffs does not demonstrate why the particular senior loans held in the Portfolio, which have primary standing among other debt held by a given borrower, are secured by specific collateral, and are subject to a variable interest rate, ¶¶ 32, 34, could not receive par value upon their current sale. As such, the valuation principle stated does not provide a sufficient basis for concluding that the defendants' prospectuses were false or misleading.

The plaintiffs also point to loans for six corporations which sold for significantly lower prices on the senior loan market than the defendants were valuing loans to the same corporations using the fair value method as evidence that the fair values assigned were false. This is simply a rehashing of the plaintiffs' previous allegations of failure to mark-to-market, and it fails for the same reason: there is no pleaded basis for determining that these market prices were a reliable basis for calculating the value of the Portfolio and the price at which the Funds' shares were bought and sold.

(4) *Derivative Misrepresentations*

The plaintiffs allege additional derivative misrepresentations during the class period that presume that the complaint states valid claims for the previously discussed misrepresentations. They assert that the defendants failed to disclose that the NAV of the Funds was not calculated in accordance with SEC rules. Having failed to adequately plead that the NAV of the Funds was not calculated in accordance with SEC rules, the plaintiffs cannot sustain this derivative claim, either. The allegation that the NAVs themselves were a misrepresentation because they were inflated due to the previously discussed misrepresentations fails for the same reason.

### B. *Scienter*

■ In order to state a claim for securities fraud, the complaint must *also*, with respect to each act or omission, state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind, in this case scienter. 15 U.S.C. § 78u–4(b)(2). This is different from the usual Rule 12(b)(6) standard, under which inferences drawn in the plaintiff's favor must merely be *reasonable* to survive. *Greebel*, 194 F.3d at 195–96. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The scienter requirement can also be met by showing a high degree of recklessness. *Aldridge*, 284 F.3d at 82. "The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity unless the complaint *also* sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992) (emphasis in original). Specific facts showing motive and opportunity may be sufficient, but mere catchall allegations that the defendants stood to benefit from

wrongdoing and had the opportunity to implement a fraudulent scheme are insufficient. *Greebel,* 194 F.3d at 197. This requirement applies even when the allegations relate to matters peculiarly within the defendants' knowledge. *Gross,* 93 F.3d at 991–92.

The plaintiffs do not allege facts giving rise to a strong inference of scienter with respect to each act or omission. Instead, the plaintiffs make general allegations about the defendants' presumed knowledge about market conditions based on their positions, and motive based on general financial incentives tied to the NAVs of the Funds. Specifically, the plaintiffs allege that the trustees and portfolio managers closely followed the development of the secondary market for senior loans, and therefore must have known that the Funds' loan interests should have been marked-to-market, that they were overstating fair value, and that the conversion from fair value pricing to mark-to-market pricing would result in a sudden and substantial drop in NAV. ¶¶ 87–90. They allege that the defendants decided to adopt mark-to-market pricing gradually over a twelve-month period in order to obscure the connection between the change in valuation policy and the substantial decline in NAV which it caused. ¶ 90. They allege that the defendants knew that if they truthfully disclosed that conversion to market pricing was going to result in a significant drop in the Funds' NAVs, few new investors or shareholders would purchase shares, and many would have submitted their shares for repurchase. ¶ 93. This would have lowered the management fees received by BMR, some of the individual defendants, and Eaton Vance. ¶ 93. The plaintiffs believe that the defendants wanted to encourage investors to purchase shares in the Funds, discourage existing investors from tendering shares for repurchase, and ensure additional income in the form of increased management and administration fees [8] by making it appear that the NAVs of the Funds were stable and that the Funds were meeting their investment objective of preservation of capital. ¶ 81.

However, the plaintiffs have pleaded no facts to support their speculative characterization of the defendants' actions. *Compare Serabian,* 24 F.3d at 363–65 (complaint sufficient because it referred to contemporaneous internal consultant report that contradicted public disclosures) *with Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878–80 (1st Cir.1991) (complaint dismissed because it contained no factual support for the plaintiff's "hypothetical tale of deception"). Stripped of pure speculation, the complaint alleges that the defendants had a duty to monitor the market, were responsible for determining the value of the Portfolio, wanted the Funds to sell shares at a stable price, and that some of the defendants received management fees that were tied to the value of the assets managed in the Portfolio. This is a generalized motive and opportunity pleading that would apply in nearly every business, and is not enough, by itself, to give rise to a strong inference that the defendants acted with scienter. *See Aldridge,* 284 F.3d at 83; *Greebel,* 194 F.3d at 197.

### III. *SECURITIES ACT CLAIMS*

The defendants also move to dismiss Counts I, II, and III for the same failure to plead fraud with particularity under the Reform Act and Rule 9(b). However, the heightened pleading requirement of the

---

**8.** With respect to the independent trustees, whose compensation is not tied to the Funds' NAVs, this direct financial motive does not exist.

Reform Act does not apply to Counts I, II, and III because they are brought under 15 U.S.C. §§ 77k, 77l, and 77o, respectively, while the heightened pleading requirement applies only to claims brought under 15 U.S.C. §§ 78a *et seq.* 15 U.S.C. § 78u–4; *In re Adams Golf, Inc. Sec. Litig.,* 176 F.Supp.2d. 216, 230 (D.Del.2001). Rule 9(b) does not apply to Counts I, II, and III because those counts expressly disavow any allegations of intentional or reckless misconduct. ¶¶ 59, 68; *In re Number Nine Visual Tech. Corp. Sec. Litig.,* 51 F.Supp.2d. 1, 12–13 (D.Mass.1999). Therefore, no heightened pleading requirement applies to Counts I, II, and III.

## IV. *CONCLUSION*

For the above reasons, Count IV, under Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, is dismissed. Because there is no 10(b) violation, there is also no Section 20(a) liability. *Van Ormer v. Aspen Tech., Inc.,* 145 F.Supp.2d. 101, 108 (D.Mass.2000). Accordingly, Count V is dismissed as well.

The defendants' motion to dismiss Counts I, II, and III is denied.

SO ORDERED.