**In re EATON VANCE CORPORATION SECURITIES LITIGATION**

No. CIV.A. 01–10911–EFH.

United States District Court, D. Massachusetts.

April 1, 2004.

**164**

Paul J. Geller, Cauley, Geller, Bowman & Rudman LLP, Boca Raton, FL, Joel H. Bernstein, Goodkind, Labaton, Rudoff & Sucharow LLP, New York City, Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP, Boston, MA, for Consolidated Plaintiff.

David J. Goldsmith, Goodkind, Labaton, Rudoff & Sucharow LLP, Richard Fooshee, Goodkind, Labaton, Rudoff & Sucharow LLP, Rochelle Feder Hansen, Bernstein, Litowitz, Berger & Grossmann, New York City, Steven E. Cauley, Cauley, Geller, Bowman & Coates, Little Rock, AK, Jeffrey A. Klafter, Klafter & Olsen LLP, White Plains, NY, Christopher J. Keller, Goodkind, Labaton, Rudoff, & Sucharow LLP, New York City, Jack Reise, Cauley, Geller, Bowman & Coates, LLP, Boca Raton, FL, John Lawlor, Mineola, NY, Theodore M. Hess–Mahan, Shapiro Haber & Urmy LLP, Boston, MA, for Plaintiffs.

Aimee E. Bierman, Kirkpatrick & Lockhart, LLP, Boston, MA, Charles Lee Eisen, Kirkpatrick & Lockhart, Washington, DC, D. Lloyd Macdonald, Kirkpatrick & Lockhart, Daniel E. Rosenfeld, Kirkpatrick & Lockhart, Boston, MA, Glenn R. Reichardt, Kirkpatrick & Lockhart, Washington, DC, J. Anthony Downs, Goodwin Procter, LLP, Stuart M. Glass, Goodwin Procter, LLP, Boston, MA, for Defendants.

### *MEMORANDUM*

HARRINGTON, Senior District Judge.

Put simply, this case involves the question of whether named plaintiffs can use the device of class certification to sue two defendants that have caused them no harm.

## I.  *BACKGROUND*

The pertinent facts are taken from this Court's previous opinions in this case. *See In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38, 40 (D.Mass.2003); *In re Eaton Vance Corp. Sec. Litig.*, 206 F.Supp.2d 142, 155 (D.Mass.2002). The four named plaintiffs sued several defendants, including four mutual funds, for violations of federal securities laws. The four mutual funds are each separate corporate entities. Although the named plaintiffs purchased shares in only two of the four mutual funds, they nevertheless filed a motion seeking to represent a class of investors who purchased shares in all four mutual funds.

As part of its ruling on the motion for class certification, this Court held, as an initial matter, that the four named plaintiffs lacked standing under Article III, Section 2 of the United States Constitution to sue the two mutual funds with which they had no contact, namely, the Eaton Vance Institutional Senior Floating–Rate Fund ("Institutional") and the Eaton Vance Advisers Senior Floating–Rate Fund ("Advisers"). *See In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. at 41. The Court reasoned that the named plaintiffs had not been injured by the Institutional or Advisers funds, and therefore no case or controversy existed between the named plaintiffs personally and these two particular defendants. *Id.* The Court further ruled that without Article III standing in their own right, the named plaintiffs could not represent other investors who may have purchased shares in the Institutional or Advisers funds. *Id.* The Court then proceeded to decide the issue of class certification. This Court's decision on class certification was appealed to the United States Court of Appeals for the First Circuit. Without ruling, the Court of Appeals stayed the case and remanded to this Court "for the limited purpose of obtaining . . . a discussion" of *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), and the "juridical link" doctrine-neither of which has received much, if any, comment by the First Circuit in prior case law. The following memorandum, therefore, is not a reconsideration of this Court's decision on the motion for class certification, but simply a discussion of *Ortiz* and the juridical link doctrine, as requested by the First Circuit.

Before delving into the law, it should be noted at the outset that *Ortiz* and the juridical link doctrine answer two separate and distinct questions. *Ortiz* deals with tim-

ing. It speaks to whether a court should address class certification issues before Article III standing issues. The juridical link doctrine deals not with timing, but rather with substance. It answers the question of whether two defendants are sufficiently linked so that a plaintiff with a cause of action against only defendant one can also sue the other defendant under the guise of class certification. The place to start is with *Ortiz*.

## II. *ORTIZ*

In *Ortiz*, the Supreme Court stated that: Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits. But the class certification issues are, as they were in *Amchem*, "logically antecedent" to Article III concerns and themselves pertain to statutory standing, which may properly be treated before Article III standing. Thus the issue about Rule 23 certification should be treated first, "mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints...."

527 U.S. at 831, 119 S.Ct. 2295 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612–13, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

■■ The Seventh Circuit has interpreted these statements broadly, holding that *Ortiz* is a "directive to consider issues of class certification prior to issues of standing." *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir.2002). The Fifth Circuit, on the other hand, has described *Ortiz* as a "limited exception" that only applies in cases where class certification issues are "logically antecedent" to Article III issues. *Ford v. NYL-Care Health Plans of the Gulf Coast, Inc.*, 301 F.3d 329, 333 n. 2 (5th Cir.2002); *Rivera v. Wyeth–Ayerst Labs.*, 283 F.3d 315, 319 n. 6 (5th Cir.2002). Under this reasoning, the general rule that "standing is an inherent prerequisite to the class certification inquiry," still applies. *Rivera*, 283 F.3d at 319 (quoting *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir.2001)). The First Circuit has not interpreted this particular portion of *Ortiz*.

This Court finds the Fifth Circuit's description of *Ortiz* as a "limited exception" to be more persuasive, and joins several other post-*Ortiz* courts that have addressed Article III standing prior to analyzing class certification issues. *See Matte v. Sunshine Mobile Homes, Inc.*, 270 F.Supp.2d 805, 826 (W.D.La.2003); *Dash v. FirstPlus Home Loan Owner Trust 1996–2*, 248 F.Supp.2d 489, 503 (M.D.N.C.2003); *Miller v. Pac. Shore Funding*, 224 F.Supp.2d 977, 995–96 (D.Md.2002); *Mull v. Alliance Mortgage Banking Corp.*, 219 F.Supp.2d 895, 909 n. 10 (W.D.Tenn.2002); *Knapp v. Americredit Fin. Serv., Inc.*, 204 F.R.D. 306, 307–08 (S.D.W.Va.2001); *Caranci v. Blue Cross & Blue Shield of R.I.*, 194 F.R.D. 27, 32 (D.R.I. 2000); *Doe v. Unocal Corp.*, 67 F.Supp.2d 1140, 1142 (C.D.Cal.1999).

There are several reasons why the Fifth Circuit's interpretation of *Ortiz* is persuasive. To begin with, the Supreme Court has never adopted a broad exception to jurisdictional requirements. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers."). Instead, the Supreme Court has warned that, as a general rule, questions of jurisdiction must be considered before the merits "since if there is no jurisdiction there is no authority to sit in judgment of anything else." *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). The requirement that jurisdiction be established as a threshold matter has been described as "inflexible and without exception." *Steel Co.*, 523 U.S. at 94, 118 S.Ct. 1003; *see also People to End Homelessness, Inc. v. Develco Singles Apartments Associates*, 339 F.3d 1, 8 (1st Cir.2003) (stating that Article III standing imposes "fairly strict requirements"). This, of course, is not an absolute rule and exceptions do exist. *See Seale v. Immigration and Naturalization Serv.*, 323 F.3d 150, 155 (1st Cir.2003). But the Supreme Court has been careful to explain or distinguish those exceptions according to the unique

facts and procedural circumstances of the pending case. *See Steel Co.,* 523 U.S. at 96–100, 118 S.Ct. 1003. "[N]one of [these exceptions] even approaches approval of a doctrine of 'hypothetical jurisdiction' that enables a court to resolve contested questions of law when its jurisdiction is in doubt." *Id.* at 101, 118 S.Ct. 1003.

It is also apparent from examining the context of *Ortiz* that its reach is limited. *Ortiz* was based on *Amchem.* In both cases, the Supreme Court was faced with extremely unique and complex problems associated with asbestos-related class actions. The Supreme Court described these cases as evolving from "an asbestos-litigation crisis," *Amchem,* 521 U.S. at 597, 117 S.Ct. 2231, that "defies customary judicial administration," *Ortiz,* 527 U.S. at 821, 119 S.Ct. 2295. Both cases involved the certification of a class that included so-called "exposure-only" asbestos plaintiffs, namely, individuals who had been exposed to asbestos, but had not yet become sick. A highly unusual procedural posture was also involved—one in which the complaint, joint motion for class certification, answer, and settlement agreement were filed with the district court all on the same day. *Amchem,* 521 U.S. at 601–02, 117 S.Ct. 2231. In short, *Amchem* and *Ortiz* were settlement-only cases that were "not intended to be litigated." *Id.* at 601, 117 S.Ct. 2231.

In *Amchem,* the opponents of class certification argued that some of the plaintiffs lacked Article III standing because they had not yet become sick from the asbestos exposure. The Supreme Court declined to reach the Article III standing issue, and instead addressed the question of class certification first. The Court adopted this approach because "[t]he class certification issues are dispositive ... because their resolution here is logically antecedent to the existence of any Article III issues." 521 U.S. at 612, 117 S.Ct. 2231. Because the Court recognized *Amchem* as a case that "was not intended to be litigated," *id.* at 601, 117 S.Ct. 2231, it is apparent that without class certification there would be no settlement; and without a global settlement, the case would not have proceeded as constituted. Therefore, the class certification questions were "dispositive" of the case as a whole, and could be described as "logically antecedent" to any other issue. *Id.* at 612, 117 S.Ct. 2231. It is against this backdrop that the Supreme Court's statements in *Amchem,* which were subsequently repeated in *Ortiz,* must be evaluated.

In the present case, the issue of class certification is not "dispositive" in the same way as in *Amchem* or *Ortiz.* Regardless of this Court's ruling on class certification, the case would proceed because at least some of the named plaintiffs appear to have valid claims against some defendants, including at least one of the mutual funds. *See Pederson v. La. State Univ.,* 213 F.3d 858, 866 n. 5 (5th Cir.2000) (stating that Article III standing issues could be considered prior to class certification "[b]ecause the class certification issue presented here is not outcome determinative"). Nor is the class certification issue "logically antecedent" to Article III concerns because "the standing question would exist whether [the four named plaintiffs] filed [their] claim alone or as part of a class." *Rivera,* 283 F.3d at 319 n. 6; *see also Clark v. McDonald's Corp.,* 213 F.R.D. 198, 204 (D.N.J.2003) (stating that "the *Ortiz* exception treating class certification as the antecedent consideration does *not* apply if the standing issue would exist regardless of whether the named plaintiff filed his claim alone or as part of a class") (emphasis in original); *Doe,* 67 F.Supp.2d at 1142. Had the four named plaintiffs not sought class certification, this Court would still be compelled to dismiss the Institutional and Advisers funds because the named plaintiffs lack Article III standing as to those two defendants.

The Fifth Circuit's interpretation of *Ortiz* is also persuasive because it conforms to pre-*Ortiz* precedent in this circuit. In *Barry v. St. Paul Fire & Marine Ins. Co.,* 555 F.2d 3, 13 (1st Cir.1977), the named plaintiffs sought to represent a class in a suit against four insurance companies, despite the fact that the named plaintiffs had contact with only two of the insurance companies. The First Circuit acknowledged precedent from another circuit that permitted such suits. *Id.* (citing *Haas v. Pittsburgh Nat'l Bank,* 526 F.2d

1083 (3d Cir.1975)). The court, however, affirmed the district court's decision "to adhere strictly to the traditional rules" and dismiss two of the defendant insurance companies. *Id.* None of the named plaintiffs bought policies from these two companies or were ever treated by a doctor holding such a policy. Therefore, the named plaintiffs "had at best only a tenuous right to bring this claim against these [two] companies." *Id.*

The principal counter argument raised by the named plaintiffs in this case is that once a plaintiff presents a case or controversy between himself personally and one defendant, the inquiry should shift from Article III standing to class certification in order to determine whether the plaintiff can sue other defendants that have caused the plaintiff no harm. Some courts have adopted this approach; the most prominent include a post-*Ortiz* case, *Payton*, 308 F.3d at 680, and a pre-*Ortiz* case, *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir.1998). Neither is persuasive.

The *Payton* court offered three justifications for permitting named plaintiffs to sue defendants that have caused them no harm. The first was that *Ortiz* rested on "the long-standing rule" that Article III requirements should be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs. 308 F.3d at 680. A review of the case law, however, shows that opposition to this rule has also been "long-standing." It was over thirty years ago that this rule was first rejected, *see Weiner v. Bank of King of Prussia*, 358 F.Supp. 684, 695 (E.D.Pa.1973), and many courts have continued to reject it in the decades since, *see e.g., Miller*, 224 F.Supp.2d at 996 ("In a multi-defendant action or class action, the named plaintiffs must establish that they have been harmed by each of the defendants."); *Pope v. City of Clearwater*, 138 F.R.D. 141, 145 (M.D.Fla.1991) (same); *Angel Music, Inc. v. ABC Sports, Inc.*, 112 F.R.D. 70, 74 (S.D.N.Y.1986) (stating that "[t]he courts of this circuit have expressly endorsed ... the principle that representative plaintiffs must have individual standing to assert claims against all the members of a defendant class").

The second justification offered by the *Payton* court was Supreme Court precedent which permitted a certified class action to proceed despite the fact that the named plaintiff's claims had become moot. 308 F.3d at 681. The doctrine of mootness, however, is not at issue in this case and the Supreme Court has been careful to distinguish Article III standing from other jurisdictional doctrines—such as mootness, ripeness, and political question. *See Allen v. Wright*, 468 U.S. 737, 750–51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (explaining that standing "is perhaps the most important of these doctrines" because it "has a core component derived directly from the Constitution"). In addition, the *Payton* court's mootness argument rested on the notion that a class, *once certified,* acquired "a legal status separate from and independent of the interest asserted by the named plaintiffs." 308 F.3d at 680 (quoting *Whitlock v. Johnson*, 153 F.3d 380, 384 (7th Cir.1998)). In this case, the Institutional and Advisers funds were dismissed before a class was certified. Thus, whatever "independent" legal status may exist had not yet attached. *See Cruz v. Farquharson*, 252 F.3d 530, 534 (1st Cir.2001) ("Only when a class is certified does the class acquire a legal status independent of the interest asserted by the named plaintiffs....")

The third and final justification offered in *Payton* was that certain legal principles, such as claim preclusion, apply to the class as a whole, rather than just to the named plaintiffs. *See* 308 F.3d at 681. The *Payton* court, however, recognized that other legal principles, such as the citizenship requirement of diversity jurisdiction, hinge entirely on the named plaintiffs, and not on the class as a whole. *See id.* The fact that some legal principles regard the entire class as the critical actor, while others consider the named plaintiffs to be the critical actor, does little, in this Court's view, to help satisfactorily resolve the present issue.

*Fallick* is even less convincing. In *Fallick*, the Sixth Circuit described a district court's ruling that a named plaintiff lacked standing to sue health insurance plans in which the named plaintiff never participated as "fundamentally flawed in two important respects."

162 F.3d at 422. One of the flaws was that the district court "confuse[d] the issue" of a plaintiff's standing under Article III and the requirements of Rule 23. *Id.* To support this assertion, the Sixth Circuit pointed to two cases. One was a Third Circuit opinion that cited no authority for its conclusory statement that "the issue here is one of compliance with the provisions of Rule 23, not one of Article III standing." *Goodman v. Lukens Steel Co.,* 777 F.2d 113, 122 (3d Cir.1985). In the other case, a district court explained that because civil rights were at issue, Article III concerns could be put aside so that the court could "carry out Congress' lofty goal" of eradicating employment discrimination. *See Cooper v. Univ. of Tex. at Dallas,* 482 F.Supp. 187, 191 (N.D.Tex.1979) (Higginbotham, J.). Such an approach would be inappropriate here because the present case does not involve discrimination.

The second flaw identified by the Sixth Circuit in *Fallick* was that the district court overlooked other healthcare insurance cases that permitted a named plaintiff participating in one plan to sue other plans. 162 F.3d at 422. In support of this argument, the Sixth Circuit cited four cases, two of which were unpublished and one which did not even mention the Article III standing issues. *See Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101 (5th Cir.1993) (Higginbotham, J.); *Misch v. Cmty. Mut. Ins. Co.,* 1995 WL 1055171, 1995 U.S. Dist. LEXIS 5059 (S.D.Ohio 1995); *Sutton v. Medical Serv. Assoc. of Pa.,* 1993 WL 273429 (E.D.Pa.1993). The remaining case explained that a more lenient view of Article III standing could be taken in healthcare insurance cases involving the Employment Retirement Income Security Act ("ERISA") because circuit precedent prescribed that the "provisions granting standing to certain classes of persons under the Act" were not to be given "an unduly cramped reading." *Doe I v. Guardian Life Ins. Co. of Am.,* 145 F.R.D. 466, 472 (N.D.Ill. 1992) (quoting *Sladek v. Bell Sys. Mgmt. Pension Plan,* 880 F.2d 972, 976 (7th Cir. 1989)). In short, circuit precedent interpreting ERISA, a statute that is not at issue in the present case, was an important factor in the court's decision regarding Article III standing.

Although the reasoning and legal citations contained in *Payton* and *Fallick* are not persuasive when applied to the current case, this does not mean that the approach taken by the Seventh and Sixth Circuit is without merit. There may well be instances when it is necessary to create exceptions to the general rule that Article III standing should be addressed before other issues, such as when there is a "national litigation crisis" that "defies customary judicial administration," as was the situation in *Amchem* and *Ortiz.* Exceptions in other situations may also be appropriate. *See Wilder v. Bernstein,* 499 F.Supp. 980, 993 (S.D.N.Y.1980) (stating that "courts have traditionally applied a broad and accommodating concept of standing in civil rights cases in recognition of the strong public interest in effective enforcement of the civil rights statutes which is not always present in commercial litigation between private parties." (citation and quotation marks omitted)).

But to find an exception here is unwarranted and ill advised. The practicalities of this case advise against it. This is a securities case. As this Court has stated previously, the need for strict standing requirements "are particularly important in the area of securities litigation, in order to curb the risks of vexatious litigation and abuse of discovery." *In re Bank of Boston Corp. Sec. Litig.,* 762 F.Supp. 1525, 1531 (D.Mass.1991) (Harrington, J.); *see also La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 469 (9th Cir.1973) (stating that "courts have manifested a marked degree of restraint" regarding standing in securities cases). The problems associated with attorney-driven securities litigation have not gone unnoticed by the courts or by Congress. *See Greebel v. FTP Software, Inc.,* 939 F.Supp. 57, 58 (D.Mass.1996) (stating that Congress enacted the Private Securities Litigation Reform Act of 1995 because of a belief "that the plaintiff's bar had seized control of class action suits, bringing frivolous suits on behalf of only nominally interested plaintiffs in the hope of obtaining a quick settlement"). Such concerns are cer-

tainly not absent in this case.[1]

Even more important, however, is the concern that adopting the arguments advanced by the named plaintiffs would run the risk that:

> any plaintiff could sue a defendant against whom the plaintiff has no claim in a putative class action, on the theory that some member of the hypothetical class, if a class were certified, might have a claim. Plaintiffs "may not use the procedural device of a class action to bootstrap [themselves] into standing [they] lack[ ]."

*Dash,* 248 F.Supp.2d at 503 (quoting *Weiner,* 358 F.Supp. at 694). The principles at the heart of Article III standing are simply too important to permit such bootstrapping. It is commonly stated that Article III standing is critical to the separation power between the judicial and political branches. *See Raines v. Byrd,* 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). But it is worth remembering that the separation of powers is not simply an end unto itself. It constitutes the essential and elemental structure of our form of government. Its ultimate purpose is to protect individual liberty. *See Mistretta v. United States,* 488 U.S. 361, 380, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("[T]he separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."). The exercise of judicial power can "profoundly affect the lives, liberty and property of those to whom it extends." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Adhering to the constitutional limits on that power "reflects a due regard for the autonomy of those persons likely to be most directly affected by judicial order." *Id.* Given such weighty concerns, this Court cannot put aside the requirements of Article III simply because a plaintiff decides to file a motion seeking to represent a class.

■ In summary, the Supreme Court's aversion to creating broad exceptions to the requirements of jurisdiction, the unique factual and procedural history of *Amchem* and *Ortiz,* the lack of persuasive reasoning contained in cases that favor the named plaintiffs' arguments, the practical realities of this case, and the important principles underlying Article III convince this Court that the *Ortiz* exception should be narrowly interpreted and its applicability does not extend to the current case. This Court took the proper approach in its earlier opinion when it considered (and rejected) the plaintiffs' Article III standing as to two of the mutual funds prior to analyzing class certification. *See In re Eaton Vance Corp. Sec. Litig.,* 219 F.R.D. at 40–41.

### III. *THE JURIDICAL LINK DOCTRINE*

Even if the *Ortiz* exception did apply to the current case, and courts were required to address the procedural requirements of class certification issues before the constitutional requirements of Article III, the named plaintiffs still could not represent a class of investors who purchased shares in the Institutional or Advisers funds because the named plaintiffs have failed to demonstrate that their claims are typical of that class, as is required by Fed.R.Civ.P. 23(a).[2] This alternative view of the case involves the application of the juridical link doctrine. Before discussing the juridical link doctrine's application, the Court pauses to explain why the doctrine is better used to address Rule 23 issues, rather than in the Court's analysis of Article III standing.

The juridical link doctrine was first conceived in dicta by the Ninth Circuit in *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 465–66 (9th Cir.1973). In its infancy, the doctrine had nothing to do with Article

---

**1.** The Court notes that the named plaintiffs claimed at oral argument that there were "millions of members of the class." Yet not one individual who purchased shares in the Institutional or Advisers funds has come forward to represent a class of those investors.

**2.** Rule 23(a) permits class actions if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

III standing. In fact, *La Mar* was a case where standing was not at issue because the Ninth Circuit assumed it to exist. *See id.* at 464. Rather, the juridical link doctrine was used to determine whether named plaintiffs were typical of the class and could fairly and adequately protect class interests as required by Rule 23. *See id.* at 465–66. The crux of the doctrine held that "a plaintiff who has no cause of action against the defendant can not [represent] those who do have such causes of action." *Id.* at 466. The Ninth Circuit, however, suggested that there were two exceptions to this rule: one for situations where the named plaintiff's injuries "are the result of a conspiracy or concerted schemes between the defendants," and another for situations where it would be "expeditious" to combine the defendants into one action because they are "juridically related." *Id.* at 466. Hence, the juridical link doctrine was born. Over time, the doctrine came to be used not only in the class certification analysis under Rule 23, but also in the standing analysis under Article III. *See, e.g., Alves v. Harvard Pilgrim Health Care Inc.*, 204 F.Supp.2d 198, 205 (D.Mass.2002) (applying juridical link doctrine to determine if a group of named plaintiffs has Article III standing to sue defendants that have caused them no harm). The First Circuit has never adopted the juridical link doctrine in either the class certification or Article III context, although some courts within this circuit have. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F.Supp.2d 172, 193 (D.Mass.2003) (discussing juridical link doctrine and holding that named plaintiffs who purchased a drug from one company could not sue other companies from whom the named plaintiffs purchased no drugs because doing so would allow named plaintiffs to acquire standing "through the backdoor of a class action" (quoting *Allee v. Medrano*, 416 U.S. 802, 828–29, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974))).

This Court has serious reservations about importing the juridical link doctrine into the Article III analysis. Underpinning the juridical link doctrine is the idea that "a single resolution of the dispute would be expeditious." *Alves*, 204 F.Supp.2d at 205 (quoting *La Mar*, 489 F.2d at 466). Article III standing, however, does not often bend to expediency and the Supreme Court has warned against such an approach. *See Raines*, 521 U.S. at 820, 117 S.Ct. 2312 (stating that an Article III standing analysis cannot be abandoned "for the sake of convenience and efficiency"); *Valley Forge*, 454 U.S. at 476, 102 S.Ct. 752 (stating that Article III standing "is not merely a troublesome hurdle to be overcome if possible so as to reach the merits of a lawsuit").

■ The juridical link doctrine's emphasis on expediency made sense in light of the fact that the doctrine was originally created to help analyze Rule 23. This is true because "Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility." *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir.1997). The requirements of Article III, on the other hand, tend to be "inflexible and without exception." *Steel Co.*, 523 U.S. at 94, 118 S.Ct. 1003. Article III imposes "fairly strict requirements," *People to End Homelessness, Inc.*, 339 F.3d at 8, because "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

■ This Court also is skeptical that a doctrine created to analyze Rule 23 requirements should be used in an Article III standing analysis because the Supreme Court has stated "that a suit may be a class action . . . adds nothing to the question of standing." *See Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Moreover, the Court has rejected, in the context of Article III standing, the basic concept supporting the juridical link doctrine: "a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, *although similar*, to which he has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (emphasis added). It is clear that class certification

and Article III standing are separate and distinct issues, regardless of whether the named plaintiff's injury is similar to that of unnamed plaintiffs. *See Abato v. Marcam Corp.*, 162 F.R.D. 8, 10–11 (D.Mass.1995) ("[T]he question of whether a named plaintiff has standing to assert a claim is an inquiry altogether separate from the question of whether the named plaintiff meets the ... requirement[s] of Rule 23."). In short, "[t]he 'juridical links doctrine' is not relevant to the issue of standing." *Matte*, 270 F.Supp.2d at 828.

■ Rather, the juridical link doctrine should be confined to an analysis of Rule 23(a). Applying the juridical link doctrine in the Rule 23 context to this case, it is clear that the Institutional and Advisers funds are not sufficiently juridically linked to the other mutual funds. To begin with, it should be emphasized that the four mutual funds are each separate corporate entities and are entitled to the legal protections flowing from their corporate status. In addition, the juridical link doctrine is most commonly applied when there is a contractual obligation among the defendants, a conspiracy among the defendants or a state or local statute which requires common action by the defendants. *See Dash*, 248 F.Supp.2d at 505 (citing *Payton*, 308 F.3d at 679). There is no evidence that any of these situations exists here.

Instead, the named plaintiffs point to the fact that the four mutual funds were managed by some of the same individuals, invested in the same set of loans, and had the same signatories to the registration statements. Even if true, these facts are of marginal relevance. The ultimate issue in this case is whether the defendants made identical false and misleading statements in their published prospectuses and registration statements. The fact that the four funds are managed by the same executives, for example, tells this Court nothing about whether the four funds actually made the same false and misleading statements. The Court also notes, as it did in its previous opinion, that it is impossible for the Court to resolve the apparent dispute between the parties over whether all the statements made by all four mutual funds

were the same because the named plaintiffs failed to provide this Court with detailed documentation regarding the various prospectuses and registration statements as part of their motion for class certification. *See In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. at 41. In the final analysis, the named plaintiffs have failed to meet their burden of establishing that class certification is appropriate, at least as it pertains to the Institutional and Advisers funds. *See Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir.2003).

## IV. *CONCLUSION*

*Ortiz* created only a limited exception to the general rule that jurisdiction must be considered before other issues. This limited exception does not apply to the current case. Even if the *Ortiz* exception did apply to this case, class certification as to all four mutual funds is nevertheless inappropriate. The named plaintiffs have failed to demonstrate that the Institutional and Advisers funds are sufficiently juridically linked to the two other mutual funds so as to meet the requirements of Rule 23.

